**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Wayne E. KWIAT, Edward J. McKeown, and Kevin D. Kehoe, Defendants-Appellants.**

**Nos. 86–2209, 86–2210 & 86–2288.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 20, 1987.

Decided April 28, 1987.

George P. Lynch, Martin S. Argan, William J. Harte, Chicago, Ill., for defendants-appellants.

Bobbie McGee Gregg, Asst. U.S. Atty., Anton Valukas, U.S. Atty., U.S. Atty's. Office, Chicago, Ill., for plaintiff-appellee.

Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Edward McKeown and a group of his friends bought 60% of the stock of the First Security Bank of Glendale Heights, Illinois, on December 31, 1981. First Security (the Bank) is chartered by Illinois, and its deposits are insured by the Federal Deposit Insurance Corp. (the FDIC). James R. Elliott, a successful real estate agent, and Kevin Kehoe, Elliott's business associate, were among the investors in the McKeown group. Elliott bought the largest single bloc. Elliott borrowed $700,000, partly to pay for his shares, and McKeown put up his own stock to secure the loan to Elliott. McKeown, Elliott, and Kehoe became directors of the Bank.

We describe the facts, as the jury might have found them, in the light most favorable to the prosecutor. McKeown, as the Bank's new President, had the authority to approve loans up to $100,000. Elliott and Kehoe lined up real estate loans for McKeown to approve. Many of the loans financed purchases of condominiums, in Orland Park, Illinois, that Harold F. McGrath owned. Elliott and Kehoe persuaded people to purchase units as tax shelters. The investors put no money down and obtained deductions for interest and depreciation; the Bank received a first mortgage; McGrath got cash from the Bank plus a second mortgage for the remainder of the price; the Elliott Financial Group (in which Elliott and Kehoe had interests) received $15,000 commission per unit. Each purchaser was told that the unit would be rented and that the rental income would be used to pay the note to the Bank. McKeown approved these transactions without obtaining appraisals of the condominium units or accurate credit information about the buyers. One effect of approving the loans was to ensure that Elliott could make payments on the $700,000 loan. As it turned out, the units were overpriced, and the Bank lent more than 100% of the market value of each. The rental income did not cover the payments on the notes, and the purchasers were unable to make up the difference. The Bank could not recoup by foreclosing on its mortgages; it lost more than $600,000 on the 20 Orland Park loans and 48 other, similar loans arranged through Elliott and Kehoe.

By May 1982 the Bank had made 18 loans on Orland units. The commissions received by Elliott and Kehoe violated the Bank's bylaws; no one told the other directors that the commissions were being paid. McKeown continued to approve these loans even after learning that the earlier loans were becoming delinquent and that Elliott and Kehoe were receiving commissions. During May 1982 a state bank examiner told McKeown that the Bank was seriously underdiversified. The condominium loans arranged through Elliott and Kehoe exceeded $3.3 million, more than half of the Bank's loan portfolio and about twice investors' equity. The state examiner asked McKeown to stop making these loans. McKeown said that he would make no more commitments, apparently reserving the right to fund two more loans on which commitments had been made. He kept the promise after closing these loans. Nonetheless, by September 1982 the loans were such a fiasco that McKeown was forced out of office.

Elliott pleaded guilty. Other defendants were acquitted on some counts by both judge and jury. After this winnowing, there remained convictions under three

statutes. McKeown and Kehoe were convicted of mail fraud, in violation of 18 U.S.C. § 1341. Kehoe was convicted of misapplying the funds of a federally insured bank, in violation of 18 U.S.C. § 656. Wayne Kwiat, who served both as McGrath's lawyer and as the Bank's closing agent in the Orland transactions, was convicted of four counts of making false statements to a federal agency, in violation of 18 U.S.C. § 1001. McKeown, Kehoe, and Kwiat all received concurrent terms of three years' probation, on condition that each perform 300 hours of community service per year.

The mail fraud convictions were based on the charge that McKeown, Elliott, and Kehoe perpetrated a scheme to defraud the Bank's depositors and stockholders (as well as the FDIC) of their honest services as directors of the Bank. The mailings were of mortgage instruments. After lending the money, the Bank had each mortgage recorded. The recorder of deeds mailed each instrument back to the Bank after recording it. Kehoe was convicted on seven counts, each one involving a mortgage on an Orland loan. McKeown was convicted on two of the same counts and acquitted by the jury on the rest; McKeown's two convictions arose out of the loans funded after the visit from the state bank examiner. We explain in Parts II and III the genesis of the misstatement and misapplication convictions.

## I

■ The mail fraud convictions depend on the "intangible rights" theory that this court has embraced. *United States v. George*, 477 F.2d 508, 513 & n. 6 (7th Cir.1973); *United States v. Dick*, 744 F.2d 546, 550 (7th Cir.1984). Under this approach, the fraudulent scheme may consist in failing to supply the honest and diligent services that one's employer is entitled to receive. Using the mails in the course of the scheme—even as an expected by-product of the scheme—completes the offense. The Supreme Court may decide in two pending cases whether this approach to the definition of a "scheme" is appropriate.

*United States v. Carpenter*, 791 F.2d 1024, 1034–35 (2d Cir.), *cert. granted*, —— U.S. ——, 107 S.Ct. 666, 93 L.Ed.2d 718 (1986); *United States v. Gray*, 790 F.2d 1290, 1294–96 (6th Cir.), *cert. granted* under the name *McNally v. United States*, —— U.S. ——, 107 S.Ct. 642, 93 L.Ed.2d 698 (1986). Meanwhile we will follow *George* and *Dick*.

■ No matter what the definition of the "scheme to defraud", there is no *mail fraud* unless the mailing is "for the purpose of executing such scheme" (as § 1341 itself provides) and is causally linked to the scheme's success. *United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986); *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). This is not to say that the mailing must itself be fraudulent. "We have held many times that 'innocent' mailings may offend the statute if they are integral parts of a scheme to defraud." *United States v. Green*, 786 F.2d 247, 249 (7th Cir.1986) (collecting authority). So the fact that the documents mailed to the Bank are truthful legal instruments is irrelevant. In every innocent-mailing case to date, however, there has been some link between the mailing and the success of the scheme. In *Green*, for example, the mailings reeled in the fish; in *United States v. Bonansinga*, 773 F.2d 166 (7th Cir.1985), the mailings on which the convictions were sustained paid for the goods the defendant then stole from his employer; in *United States v. Murphy*, 768 F.2d 1518, 1529–30 (7th Cir. 1985), the mail reimbursed counsel for the money used to bribe the judge.

■ The mailings in this case—of documents from the recorder of deeds to the Bank—did not make the fraud possible or facilitate it. They did not help McKeown and Kehoe rake in money from the Bank; they did not reduce the quality of the intangible services McKeown and Kehoe supplied to the Bank; they did not help McKeown and Kehoe hide their delicts or postpone the day of reckoning. The mailings are offshoots of the loans, but honest

services would have produced the same sort of mailings.

The cases most helpful to the government are *United States v. Fallon*, 776 F.2d 727 (7th Cir.1985), and *United States v. Cina*, 699 F.2d 853 (7th Cir.1983), in which the mails were used to carry automobile titles from the defendants to, or among, state officials. Cf. *United States v. Galloway*, 664 F.2d 161 (7th Cir.1981). The schemers rolled back the odometers of the cars, then used innocent state officials to obtain titles showing odometer readings at the altered rather than the actual number of miles. We held that the mailings of the title applications violated the statute because they facilitated the schemes to fleece the purchasers of the cars. In these cases, as in today's, the mailings of the title documents sometimes followed the fraudulent sale or loan. The difference is that conveying good title showing the altered reading was an essential part of the scheme. Had the defendants not been able to put good title papers in the hands of their purchasers, the purchasers would have gone howling to state officials and stopped the scheme quickly. The mailing on the first sale therefore was an essential ingredient of any further sales. In our case, by contrast, a failure by the recorder of deeds to mail the recorded mortgage would not have sent anyone scurrying to the police or tipped off other employees at the bank. Getting each mortgage recorded was unrelated to the directors' defrauding the Bank of their honest services. Had the recorder of deeds not mailed the mortgages, someone from the Bank would have picked them up. A clerk might have become riled, but not at McKeown or Kehoe; no amount of trouble with the recorder of deeds would have tipped off anyone to any part of the scheme or hindered it in the slightest.

If this "scheme" in conjunction with this sort of mailing is mail fraud, then any corporate officer's breach of fiduciary duties is mail fraud, for every corporation uses the mails in some way or another. The government has not cited any legislative history of § 1341 suggesting that Congress meant to condemn as a federal felony every breach of common law fiduciary duties. When asked at oral argument, counsel for the government commendably conceded that affirmance in this case would take the mail fraud statute farther into the ordinary domain of state corporate law than any other case decided to date. Neither the language nor the legislative history of § 1341 hints that it is an all-purpose remedy for corporate mismanagement. Unless all flouting of corporate duties is mail fraud, this scheme is not criminal under § 1341. We therefore reverse the convictions of McKeown and Kehoe for mail fraud.

■ This is a windfall for Kehoe, who did not argue on appeal that the mailings were unrelated to the scheme. (He argued instead that the evidence did not establish that he acted with intent to defraud the Bank.) But McKeown raised the point clearly, and Kehoe was convicted on the same two counts as was McKeown. It would be anomalous to affirm the convictions of Kehoe while holding that the indictment did not charge McKeown with an offense. Perhaps Kehoe does not much care about the mail fraud convictions; as we conclude in Part III, he was properly convicted of misapplying the Bank's funds and received concurrent sentences. Still, both defendants preserved their issues at trial and deserve equal treatment on appeal. It would be "plain error", Fed.R. Crim.P. 52(b), to affirm the conviction of Kehoe for mail fraud having already held that the charge fails against McKeown. McKeown and Kehoe may have committed crimes in the course of defrauding the Bank, but mail fraud was not among them.

## II

Kwiat's convictions under § 1001 were based on statements that Kwiat, as a lawyer, made in forms delivered at the closings on the loans. These HUD–1 forms, required by the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq., inform both seller and buyer about the costs of each settlement service provided and the application of the funds of the sale. The

form contains a blank for the broker's commission. At Elliott's direction, Kwiat recorded a commission of $7,500 on each sale, although the full commission was $15,000. The lie about the amount of the commission is the "false statement" of which Kwiat was convicted.

Although § 1001 states that it is criminal to make "any false, fictitious or fraudulent statements or representations" in "any matter within the jurisdiction of any department or agency of the United States", the prosecutor concedes that a false statement is not a crime unless the statement is material to the work of the agency. See *United States v. Bailey*, 734 F.2d 296, 305 (7th Cir.1984); *Dick*, 744 F.2d at 552–53. Deliberately using the wrong middle initial for the seller is not a felony—not unless the right middle initial could be important. Kwiat contends that the lie about the commission is not material to the duties of any agency.

The agency in question is not the Department of Housing and Urban Development, which administers the Real Estate Settlement Procedures Act and wrote form HUD–1. It is the Federal Deposit Insurance Corporation. The prosecutor sought to establish materiality through the testimony of an employee of the FDIC, who stated that the FDIC sometimes looks at HUD–1 forms in banks' files to obtain information concerning real estate loan transactions. This witness did not testify, however, that the FDIC's examiners had looked at any of the HUD–1 forms that Kwiat completed or that the difference between the $7,500 commission reported on the forms and the actual $15,000 commission would or could have influenced any action of the FDIC.

 False statements may be material even though they do not mislead anyone, so long as they have the potential to influence the agency's conduct. *United States v. Brantley*, 786 F.2d 1322, 1326 (7th Cir. 1986); *United States v. Malsom*, 779 F.2d 1228, 1235 (7th Cir.1985). The agency's ability to nose out the truth—or its inattentiveness on a given day—does not excuse a lie that is otherwise material. The materi-

ality of a misstatement depends on the effect that is reasonably anticipated at the time the statement is made, not on how things turn out. If a statement has a potential to mislead the agency on some significant matter, then it is material. The prosecutor argues that this principle carries the day. The government's brief states: "the false statement on the HUD–1 forms, which helped conceal the fiduciary fraud, was capable of influencing the decision of a government agency." But no witness at trial said this; the employee of the FDIC spoke in the most general terms and never linked the agency's procedures with the size of commissions. So far as the record shows, the *amount* of the commission is irrelevant both ex ante and ex post. Perhaps a lie about the *existence* of a commission would have a tendency to mislead the FDIC, but these forms revealed that Elliott was receiving $7,500. Revealing that a director of the Bank was receiving commissions would tend to tip off the FDIC; Kwiat's HUD–1 forms truthfully reported this. That the commission was $15,000 rather than the reported $7,500 is irrelevant in this case and would be irrelevant in every similar case. The commission obviously was not irrelevant to McGrath, who paid it, but a lie to McGrath is not covered by § 1001, and at all events the parties agree that McGrath agreed to pay $15,000 per sale and that Kwiat furnished McGrath with work sheets showing the full commission.

The prosecutor relies most heavily on *Bailey*, which affirmed a conviction under § 1001 of another closing agent who lied in closing forms. Bailey, the agent of the Farmers Home Administration, was given $33,000 (the amount being borrowed by the new purchasers) and told to disburse the money first to pay off an existing loan secured by the property. He filed a closing statement representing that he had done so. Actually, Bailey kept all but $4,200 of the money, leaving the former loan unsatisfied and the security interest in place. The lie affected the amount of security the FHA obtained and obviously was material, as the court held. The truth would have led the FHA to investigate and recapture

the money from Bailey. Nothing similar happened here. The FDIC did not instruct Kwiat how much to disburse and to whom, or decide whether to make the loans. The HUD–1 statements are useful only after the fact in learning how McKeown and his friends were managing the Bank's affairs. For the FDIC's purposes, the essential fact revealed by the forms was that members of the board were engaged in self-dealing. The exact amount of the commission was not important, either actually or potentially—at least the witness from the FDIC did not testify that it was important. The record therefore does not contain sufficient evidence to support a finding of materiality, and Kwiat's convictions must be reversed.

### III

Kehoe's conviction for misapplying bank funds was based on a loan of $100,000 he obtained from the Bank in January 1982. Kehoe posted as security for the loan the beneficial interest in a trust that held the title to Kehoe's house. The note and security agreement in the Bank's favor purportedly were signed by Kehoe's estranged wife. The signature was a forgery. Kehoe's wife did not consent to the loan or security. Worse, the beneficial interest in the trust had been used in 1979 to secure another loan. Kehoe promptly wired $80,-000 of the money to Elliott, who had borrowed $100,000 from the Bank already and was forbidden to borrow more. The Bank has yet to recover the full sum lent to Kehoe. Kehoe does not challenge the instructions to the jury or the sufficiency of the evidence on this count. He complains, instead, about the behavior of the prosecutor and the district judge during the trial.

 Two arguments are feeble. Kehoe complains that the prosecutor, in closing argument, said that Kehoe personally forged his wife's signature; all the evidence shows, according to Kehoe, is that someone forged it. Perhaps so, but unimportant. The identity of the forger is both collateral to the case and a fair inference from the record. See *United States v. Serlin*, 707 F.2d 953, 960 (7th Cir.1983).

Kehoe also protests that the jury was given a "dynamite" charge. The jury deliberated seven hours after receiving the charge before convicting Kwiat and acquitting Paul D. Olson. The jurors gave the judge a note stating that they could not agree on the remaining charges and believed that further deliberation would be "fruitless"; the judge sent the jurors home for the night. When they returned the next day, the judge gave the *Silvern* deadlock instruction, see *United States v. Silvern*, 484 F.2d 879 (7th Cir.1973), and three hours later the jury returned a verdict finding Kehoe and McKeown guilty on some counts and not guilty on others. The *Silvern* charge was appropriate here, and deliberation for seven hours after a multi-defendant trial that lasted nine days does not compel a district court to grant a mistrial. The district judge has great discretion to determine how long deliberations should continue, and he did not abuse that discretion here.

Kehoe's more substantial argument is that the district judge berated his counsel in front of the jury, diminishing the jury's respect for the defense efforts. Counsel repeatedly asked questions that the judge thought irrelevant, outside the scope of the direct examination, or otherwise improper. Some of these the judge prohibited without waiting for objection. In an extended dialogue outside the jury's presence, the court dressed counsel down for trying to ask a witness her opinion on the ultimate issue of Kehoe's intent. The court stated:

> Well, frankly, my dilemma, or your dilemma is, you're either deliberately indifferent to the rules of evidence or you're ignorant of the rules of evidence. I suppose the latter is less serious, but it's still very serious....
>
> Now, I would suggest that between now and tomorrow morning, you get yourself an elementary book, the most elementary one you can find on evidence, the examination of witnesses, ... just the mere concept of relevance, review it. And see if you can't improve your performance here. I'm really seriously concerned about you.... Now, I will say that I'm not concerned from the stand-

point of your clients [sic], because all of your errors are in his favor.... And this is why I am frankly prompted to wonder whether your problem is ignorance or whether you're deliberately flaunting [sic] the rules which govern trials in this court.

We need not discuss whether the judge's appreciation of counsel's competence is accurate. What concerns us is that some of the criticism became apparent to the jury as well as to counsel. For example, during counsel's cross-examination of Kehoe's wife, who testified for the prosecution, the judge made the following remarks in open court:

I'll give you one more chance. If you have anything you want to ask that's within the scope of the direct examination, ask it. Otherwise I'll excuse the witness, as far as you're concerned; maybe other counsel have questions.

. . . .

Obviously this witness wants to give testimony that she and you regard as favorable to Mr. Kehoe. If that testimony is relevant, the time to present it is during your part of the case.... Now, I'm going to give you no more warnings. I'm losing patience. In fact, I'm out of patience. One more time and that's it.

During the examination of another witness the judge interjected:

That's over the line. Now, if you can't adhere to it, I'll have to terminate the examination. So my advice is, ask all the questions that are clearly proper. ... And then if you think you're going to get into some hazy territory, I'll cut you off at the first one because I'm not going to conduct a school here. I haven't got the time. Nor does the jury.

There are a few similar interjections. Kehoe maintains that they aligned the judge with the prosecution and deprived him of a fair trial.

■ A judge should both be and be seen to be evenhanded. The jurors may draw unwarranted inferences from perceptions of partiality. Yet a judge also must regulate the conduct of the trial, and this will require taking sides in skirmishes—for ex-

ample, a judge takes sides when sustaining one party's objection at the expense of another. It is not possible to manage a complex trial without saying in front of the jury: "Counsel, you are wrong, and I agree with your adversary." Every objection sustained, every motion denied, has a potential to reflect on a lawyer's competence and to evoke a perception of partiality. Kehoe's principal argument—that a judge may not do anything during trial that reflects adversely on the professional competence of counsel—is therefore untenable. Cf. *United States v. LeFevour*, 798 F.2d 977, 985 (7th Cir.1986).

The examination of a witness requires judicial supervision. The judge cannot continually send the jury out of the room in order to remind counsel how to conduct an examination. That would complicate and prolong jury trials even more than they are already. Some remarks therefore will be overheard. The judge should reserve extended and harsh criticism for times when the jury is absent, which the judge in this case did. Jurors need not be shielded from all other signs of displeasure. There is a line between incessant, gratuitous, personal criticism and threats of the sort we condemned in *United States v. Spears*, 558 F.2d 1296 (7th Cir.1977), and occasional reminders to counsel that if he has no questions within the scope of the direct examination he must desist. When counsel does not get the message, he must expect it to be repeated. See also *United States v. Williams*, 809 F.2d 1072, 1086–91 (5th Cir. 1987).

■ The district judge showed asperity in front of the jury no more than five times during an extended trial. The first and mildest exchange occurred during the third day of trial. There were no others until the fifth day, by which time the judge had become concerned that the transgressions were deliberate rather than ignorant. Counsel does not say that his questions were proper; he maintains only that the judge should have been gentle when terminating improper questions. Some of the latter remarks are close to the line; it would be well to avoid statements such as

"I'm not going to conduct a school here. I haven't got the time. Nor does the jury." Such a comment appears gratuitously insulting to counsel. Yet Kehoe does not have a powerful argument for reversal when counsel did not complain to the judge during the trial. Not once did counsel ask the judge to excuse the jury so that the matter could be discussed privately. Not once did he ask the court to explain to the jury that testy remarks should not be held against Kehoe. Counsel told us that he did not want to arouse the judge's ire anymore. But the judge was annoyed by a skein of improper questions; there is nothing improper (and therefore nothing annoying) in asking for a conference at the side bar or in the jury's absence. Judges are accustomed to requests from counsel. Civil comments about the operation of the trial should be encouraged. We will not presume that district judges are so thin-skinned and vindictive that counsel should be allowed to bypass the most immediate way of dealing with their grievances about the conduct of the trial—requests to the presiding officer.

This applies as well to Kehoe's protest that the judge asked questions of some witnesses, eliciting information that favored the prosecution. The judge asked about 60 questions during the eight days of testimony. A judge may ask questions. Fed.R.Evid. 614(b); *United States v. DiVarco*, 484 F.2d 670, 675 (7th Cir.1973). Not once did counsel object. Now it may be hard to object when the judge pops a surprise question. But counsel could have asked the judge, out of the jury's presence, to desist or to save questions until the end of a witness's testimony. Fed.R.Evid. 614(c) allows objections to questions from the bench to be postponed in this way; it does not excuse the failure to object at all.

The judge took an active role in this trial, which we do not seek to discourage. Passive presiding may contribute to long, unmanageable trials. Nothing Chief Judge Grady did made Kehoe's trial unfair. The convictions of McKeown and Kwiat are reversed. Kehoe's mail fraud convictions are reversed, and his conviction for misapplying bank funds is affirmed.