**William A. BRANDT, Jr., Plaintiff,**

**v.**

**SCHAL ASSOCIATES, INC., et al., Defendants.**

**No. 85 C 357.**

United States District Court, N.D. Illinois, E.D.

July 6, 1987.

David L. Campbell, St. Louis, Mo., for plaintiff.

Jeff Harris, John J. Foran, Karen A. Suizzo of Foran, Wiss & Schultz, Chicago, Ill., for Schal Assoc.

Robert A. Downing, David F. Graham, Eugene A. Schoon, John A. Heller of Sidley & Austin, Chicago, Ill., for Northwestern.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Suing as the assignee of Crescent Corporation ("Crescent"), William A. Brandt, Jr. ("Brandt") charges Schal Associates, Inc. ("Schal"), Richard C. Halpern ("Halpern") and Evans N. Spileos ("Spileos") (collectively "Schal Defendants") and Northwestern University ("Northwestern") with having violated:

1. the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), (b), (c) and (d) (each further citation to Title 18's RICO provisions will simply take the form "Section —"); and

2. state common law.[1]

Despite the nearly 2½ year life of this action, it still remains in the pleading stage.[2] Now Schal Defendants and Northwestern have again moved under Fed.R. Civ.P. ("Rule") 12(b)(6) for dismissal of the RICO claims. For the reasons stated in this memorandum opinion and order, Northwestern's motion is granted and Schal Defendants' motion is denied.

### Facts[3]

Schal manages the construction of high-rise buildings (¶ 3). Both Halpern and Spileos are officers, directors, employees and principal shareholders of Schal (¶¶ 5 and 6). Schal was engaged to act as agent for:

1. M.O.W. in procuring the design and construction of the "One Mag Mile Project" (¶ 24);

2. Northwestern in procuring the design and construction of its law school building ("Northwestern Project") (¶ 7); and

3. Chicago Board Options Exchange ("CBOE") in procuring the design and construction of the "CBOE Project" (¶ 29).

### One Mag Mile Project

On January 22, 1981 Schal, acting for M.O.W., hired Crescent to furnish and install the window wall system for the One Mag Mile Project for $4,885,000 (¶¶ 8 and 24). After Crescent had begun work on the project, Schal issued numerous directives calling for extra work (¶ 43), including 26 change orders that added $491,996.69 to the contract amount (¶¶ 26 and 36(g)). Those directives were "coupled with promises to pay Crescent for the goods and services provided" (¶ 36(g)).

In connection with the One Mag Mile Project, Schal also issued six backcharges to Crescent (totaling $9,956.10) between March 17, 1983 and February 1, 1984 (¶¶ 36(a)–(f)). Each backcharge represented that Schal had incurred additional costs because of Crescent's actions, so the back-

---

1. Three common-law theories are advanced: breach of contract, fraud and quantum meruit.

2. Crescent initially brought this action in January 1985 against the present defendants as well as M.O.W. Construction Company ("M.O.W."), individually and as a representative of a putative class. At that time it was assigned to this Court's colleague, Honorable Nicholas Bua. Later Crescent entered into an assignment for the benefit of creditors, causing (1) the October 24, 1986 substitution of Brandt for Crescent as plaintiff and (2) the filing of the First Amended Complaint. After defendants had then filed motions to dismiss that Complaint, the case was reassigned (on December 17, 1986) to this Court's calendar. This Court's February 2, 1987 oral ruling:

    1. granted Schal Defendants' and Northwestern's motions to dismiss without prejudice to Brandt's repleading; and

    2. granted M.O.W.'s motion to dismiss with prejudice.

Brandt's Second Amended Complaint (the "Complaint"), the focus of this opinion, then followed. All this is not to say the case has lain dormant during the procedural skirmishes. There has been extensive discovery, a matter dealt with later in this opinion.

3. Rule 12(b)(6) principles require this Court to accept as true all well-pleaded factual allegations, drawing all reasonable inferences in Brandt's favor. *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985). All citations to the Complaint will simply take the form "¶ —." Schal Defendants' memoranda in support of their motion will respectively be referred to as "Schal Mem." and (for the reply memorandum) "Schal R. Mem." Northwestern's memoranda will similarly be referred to as "Northwestern Mem." and "Northwestern R. Mem." Brandt's memoranda will be referred to as "Brandt/S Mem." (in response to Schal Defendants' motion) and "Brandt/N Mem." (in response to Northwestern's motion).

charge amounts would be deducted from the monies due Crescent upon completion of the project (*id.*).

Crescent has completed all contract and extra work on the One Mag Mile Project. It is still owed $731,268.59 for that work (¶¶ 27 and 28).

### Northwestern Project

On August 27, 1982 Schal, acting for Northwestern, hired Crescent to furnish and install a complete interior and exterior curtainwall and store front system (the "curtainwall system") for the Northwestern Project at a cost of $3,855,000 (¶¶ 10 and 14). As it turned out, the structural steel framing for the Northwestern Project had design defects, causing the framing to be inadequate for the curtainwall system (¶ 17). Defendants knew of those defects when they negotiated and executed the contract with Crescent. but they concealed the flaws from Crescent until October 1982 (*id.*).

At Schal's request Crescent undertook the redesign of the curtainwall system and assisted Northwestern in finding a satisfactory solution to the engineering and design problems (¶¶ 19–20). Schal and Northwestern assured Crescent that upon completion of the project change orders would be issued to cover Crescent's increased costs of $3,639,888 (¶¶ 20–21 and 35(a)).

Schal also issued 26 backcharges to Crescent (totaling $285,606.51) between October 11, 1983 and November 16, 1984 (¶¶ 35(b)-(aa)). Here too, each backcharge represented that Schal had incurred additional costs because of Crescent's actions, so the backcharge amounts would be deducted from the monies due Crescent upon completion of the project (¶ 34(a)(3)).

Crescent has also fully performed all contract and extra work on the Northwestern Project. It is still owed $4,086,146.40 for that work (¶ 23).

### CBOE Project

On November 2, 1982 Schal, acting as agent for CBOE, hired Crescent to furnish and install the window wall system for the CBOE Project for $700,000 (¶¶ 8 and 29). After Crescent began that work, Schal is-sued 18 change orders to the basic contract, covering additional work costing $172,498.37 (¶ 31).

Crescent completed all contract and extra work on the CBOE Project April 23, 1984. It is still owed $8,212.50 (¶¶ 32 and 33).

### RICO Allegations

To some extent the Complaint's RICO allegations are not only fact-conclusory in nature (something both permissible and desirable under the Rules' notice-pleading regime) but also legal-conclusory (something that poses problems in meeting the "well-pleaded" standard—see n. 3). This recital will nevertheless credit the allegations as made, without any effort to cull out any that might be viewed as technically deficient:

1. On an unknown date Schal, Halpern and Spileos entered into a contract and association-in-fact ("Schal Enterprise") "whereby they undertook to use their position as Construction Manager of the Northwestern, One Mag Mile and CBOE Projects and the fact that there were common contractors and subcontractors on many of the same aspects of each of said Projects, so as to exert pressure on subcontractors to accept false and fraudulent backcharges with respect to such projects by the expedient of refusing to pay said contractors monies rightfully due to them on companion projects over which said defendants had control" (¶ 8).

2. Schal Defendants entered into an agreement in connection with the One Mag Mile Project (¶ 34):

(a) to induce Crescent to perform extra work on that project by authorizing the performance of extra work (for which they intended not to pay Crescent), making it economically impossible for Crescent to withdraw from, rather than perform extra work on, the project;

(b) "to attempt to enhance defendants' bargaining position at the time that the One Mag Mile Project would be completed and the negotiated close-out of the Crescent contract and com-

pensation for its extra work become [sic] necessary," by mailing Crescent false backcharges; and

(c) to coerce Crescent into foregoing its claims for extra compensation and into accepting the false backcharges on the One Mag Mile Project by refusing to pay Crescent money owed it from work on the Northwestern and CBOE Projects unless Crescent accepted the backcharges.

3. Schal Defendants *and* Northwestern entered into an almost identical agreement in connection with the Northwestern Project (¶¶ 34(a) and 35(a)):

(a) to induce Crescent to perform extra work on that project by (1) concealing design defects, (2) falsely promising to issue change orders and (3) threatening unilaterally to terminate Crescent's contract and inflict harm on Crescent's business and reputation;

(b) to enhance their bargaining position at the time the Northwestern Project would be completed and compensation for Crescent's extra work would become necessary, again by mailing Crescent false backcharges; and

(c) to coerce Crescent into accepting the false backcharges by refusing to pay Crescent money due it from work on the One Mag Mile and CBOE Projects.

4. Schal Defendants committed the following racketeering acts to carry out the agreements just described in Paragraphs 2 and 3:

(a) They issued (through the mail and over the telephone) numerous directives to Crescent, instructing it to perform extra work and promising to

pay for that extra work, but intending not to do so (¶¶ 35(a) and 36(g)).[4]

(b) Though they knew the stated reason for the contract price reduction in each backcharge was false, they mailed a series of backcharges to Crescent, with the intent of depriving Crescent of money due it under the contract (¶¶ 35(b)-(aa) and 36(a)-(f)).

(c) They coerced Crescent into accepting those false backcharges by:

(1) exerting unauthorized control over monies due Crescent from work on the other projects it had worked on, refusing to pay Crescent those monies unless Crescent accepted the fraudulent backcharges and paid Schal Defendants $100,000 to boot (¶¶ 35(bb) and 36(h)); and

(2) threatening (if Crescent did not accept the backcharges) (a) to terminate each contract with Crescent unilaterally, (b) to attempt to extract from Crescent all of the completion costs of the window wall [curtainwall] system (*id.*) and (c) (on the One Mag Mile Project only) to inflict harm on Crescent's business and reputation (¶¶ 35(a) and 36(h)).

As to the Northwestern Project, Schal Defendants did those things with Northwestern's knowledge and consent.

*Pattern of Racketeering Activity*

Each of Schal Defendants and Northwestern seeks dismissal of Brandt's RICO claims on the ground the Complaint does not adequately allege the existence of a "pattern of racketeering activity."[5] All Section 1962 claims require such a pattern (*Elliott v. Chicago Motor Club*, 809 F.2d 347, 349 (7th Cir.1986)).[6]

4. On the Northwestern Project, Complaint ¶ 35(a) also alleges defendants coerced Crescent into providing extra work by threatening to inflict harm on Crescent's business and reputation if Crescent did not accede to defendants' demands.

5. Schal Defendants move alternatively for summary judgment, attaching a good deal of evidentiary material to their submission. After this Court had received Schal Defendants' opening memorandum, it advised the parties it would

deal only with the dismissal motion in the first instance.

6. Section 1962(a) renders unlawful (among other things) the use of income derived by any person "from a pattern of racketeering activity" in the operation of an enterprise engaged in, or whose activities affect, interstate commerce. Section 1962(b) makes it unlawful for any person "through a pattern of racketeering activity" to acquire or maintain any interest in or control of such an enterprise. Section 1962(c) makes it

In its decisions since *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985),[7] our Court of Appeals has applied "a factually-oriented standard, not a set rule" (*Morgan*, 804 F.2d at 977), in determining whether RICO claims satisfy the "pattern of racketeering activity" requirement. Examination of those decisions and the standard as it has evolved from them makes it quite plain the Complaint in this case sufficiently alleges Schal Defendants'—but not Northwestern's—involvement in such a pattern.

*Morgan*, 804 F.2d at 975 (citations omitted) described the "pattern of racketeering activity" requirement this way:

The acts must demonstrate both a continuity and a relationship in order to constitute a pattern of racketeering activity. However, the proposition that the predicate acts must always occur as part of separate schemes in order to satisfy the continuity aspect of the pattern requirement focuses excessively on continuity, and therefore cannot be accepted as a general rule. Otherwise defendants who commit a large and ongoing scheme, albeit a single scheme, would automatically escape RICO liability for their acts, an untenable result.

Instead, we agree with those courts that have steered a middle course between these two extremes. In order to be sufficiently continuous to constitute a pattern of racketeering activity, the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, *i.e.,* "transactions 'somewhat separated in time and place.'" ... Relevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries.

Consideration of those factors in this case reveals the Complaint as to Northwestern fails to satisfy the continuity aspect of the pattern requirement.

Most important in that regard is the absence from the Complaint of any allegation linking Northwestern to Schal Defendants' claimed scheme to defraud Crescent on the One Mag Mile Project. Instead Brandt asserts nothing more than Northwestern's involvement in a scheme to defraud Crescent into doing extra work without pay on a single construction project. All Northwestern's "racketeering" acts[8] were designed with that one narrow focus:

1. Design defects were concealed from Crescent so it would begin work on the curtainwall system and then become unable (for economic reasons) to refuse to perform the extra work required as a result of the design defects.

2. Threats to terminate Crescent's contract with Northwestern and to injure Crescent's business and reputation were made to coerce Crescent into performing the extra work.

3. False backcharges were mailed to Crescent so that when the contract was

---

illegal for any person employed by or associated with such an enterprise to conduct or participate in the conduct of the enterprise's affairs—again through a "pattern of racketeering activity." Finally Section 1962(d) makes it unlawful for any person to conspire to violate any of Sections 1962(a), (b) and (c).

7. *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 818–19 (7th Cir.1987); *Marks v. Pannell Kerr Forster,* 811 F.2d 1108, 1110–12 (7th Cir.1987); *Elliott,* 809 F.2d at 349–50; *Morgan v. Bank of Waukegan,* 804 F.2d 970, 973–77 (7th Cir.1986); *Lipin Enterprises, Inc. v. Lee,* 803 F.2d 322, 323–24 (7th Cir.1986); *Illinois Department of Revenue v. Phillips,* 771 F.2d 312, 313 (7th Cir.1985) (but see n. 11).

8. This characterization accepts Brandt's label with an uncritical eye, as Rule 12(b)(6) requires. But it must be remembered that "racketeering activity" is a term of art—one defined in Section 1961(1)—and not, as Brandt appears to employ it, simply an epithet. If (as seems most likely) Brandt must look to acts of mail fraud to meet the statutory definition, some questions would have to be answered before Brandt could stay in court on a RICO theory as to each of the four kinds of alleged acts described next in the text:

1. As to all but the third (the "false backcharges" item), the use-of-the-mails component of mail fraud is unclear.

2. As to the false backcharges, the necessary element of detrimental reliance is unexplained (see *United States v. Kwiat,* 817 F.2d 440, 443 (7th Cir.1987)).

closed out Northwestern could refuse to pay Crescent for the extra work it had performed.

4. Money due Crescent on two unrelated construction projects was denied Crescent to coerce Crescent's acceptance of the false backcharges.

As *Marks*, 811 F.2d at 1112 so aptly put it in describing a comparable situation:

> The acts alleged related to a single scheme to defraud a single victim in what appears to be a "one-shot" effort to inflict a single injury. Such a factual scenario simply fails to satisfy the continuity aspect of racketeering activity required by *Sedima*.
>
> \* \* \* \* \* \*
>
> In the instant case, the acts alleged, while multiple, represented the entire scheme, which necessarily would end after its single accomplishment.

See also *Procter & Gamble Co. v. Big Apple Industrial Buildings, Inc.*, 655 F.Supp. 1179, 1182 (S.D.N.Y.1987):

> An undertaking by a contractor engaged in a lawful enterprise to bilk one customer in one construction project of finite duration and scope does not satisfy the "continuity" element of the pattern of racketeering.[9]

In an effort to satisfy the pattern requirement, Brandt/N Mem. 5 baldly asserts there were several underlying fraudulent schemes and each of the predicate acts created a separate and distinct injury. Brandt/S Mem. 9 attempts to describe what those distinct injuries were:

> These [predicate] acts each relate to a separate event or transaction or a separate incident whereby defendants obtained "income" from the plaintiff.

**9.** [Footnote by this Court] In *Procter & Gamble* the defendant contractor had:

    1. overstated its experience and expertise;
    2. understated expected costs;
    3. made excessive and improper requisitions from a bank; and
    4. fraudulently abused escrow accounts.

**10.** Again, as n. 8 suggests, Brandt does not explain how a backcharge (even if mailed) can be the subject of detrimental reliance, so as to constitute a predicate act of mail fraud in any event.

But as Schal R. Mem. 8 n. 9 points out, that characterization is completely at odds with the Complaint's allegations—that the backcharges were designed to enhance defendants' bargaining position at the close-out of the contract:

> If the defendants already had obtained "income" through issuance of each backcharge, it is incomprehensible how these backcharges would ever enhance defendants' bargaining position after the jobs were over or why defendants at that point would be asking Crescent to accept the backcharges.

From the Complaint allegations it is plain that Crescent's sole injury was its nonreceipt of money allegedly due it upon completion of, and for extra work performed on, the Northwestern Project. Each predicate act contributed to that single injury.[10]

Brandt/N Mem. 5–6 next urges the Complaint satisfies the pattern requirement as to Northwestern because this case is like *Phillips*. There a defendant who operated a gas station and had filed fraudulent sales tax returns for nine straight months was found to have engaged in a pattern of racketeering activity (771 F.2d at 313). Although the *Phillips* Court simply stated that conclusion without analysis, *Marks*, 811 F.2d at 1112 later explained and distinguished *Phillips* this way:

> The activity [in *Phillips*] would have continued indefinitely until detected. In the instant case, the acts alleged, while multiple, represented the entire scheme, which necessarily would end after its single accomplishment. In *Phillips*, the acts alleged were part of a scheme indefinite in time and with ongoing "accomplishments" or results. The acts were continuous and related.[11]

**11.** [Footnote by this Court] Before *Sedima* our Court of Appeals had been one of the many courts that had uncritically accepted the notion that two acts of racketeering activity automatically sufficed to establish a "pattern." Indeed, most RICO decisions applying that concept stemmed from criminal appeals (see, e.g., *United States v. Weatherspoon*, 581 F.2d 595, 602 (7th Cir.1978)) in the early period when civil RICO had not even reached its formative stage, let alone its current level of fashion. That notion of a two-act "pattern" reflected a perhaps

In no way could Northwestern's alleged scheme have continued indefinitely. Like the scheme in *Marks*, it necessarily had to end upon completion of the Northwestern Project and the closing-out of the Crescent contract. And as both *Marks*, 811 F.2d at 1111–12 and *Lipin*, 803 F.2d at 324 explained, that means the Complaint's failure to allege either that:

1. Northwestern has defrauded another victim with similar racketeering acts or

2. Crescent was itself defrauded more than once by Northwestern through similar racketeering acts [12]

is fatal to the RICO claims.

■ In sum, the Complaint fails to satisfy the continuity aspect of the pattern requirement because it alleges Northwestern engaged in a single and finite scheme to defraud a single victim into performing extra work on a single construction project—resulting in a single injury (albeit by a series of alleged predicate acts over the course of that project). Brandt's RICO claim against Northwestern is therefore dismissed. And that dismissal counsels the dismissal of what would be no better than pendent *party* claims against Northwestern even if the RICO claims against Schal

Defendants survive here (see this Court's opinion in *Prudential-Bache Securities, Inc. v. Lisle Axis Associates*, 657 F.Supp. 190, 194–97 (N.D.Ill.1987)).[13]

■ Brandt's RICO claims against Schal Defendants are another matter. As n. 12 has intimated, this Court finds those claims survive scrutiny at this pleading stage because the Complaint alleges Schal Defendants, through virtually identical racketeering acts, *twice* defrauded Crescent of money due it on *two* separate construction projects. As *Lipin* and *Marks* put it, the Complaint alleges the defendant defrauded the same victim more than once by similar racketeering acts. At least as a pleading matter, then, the pattern requirement is satisfied as to Schal Defendants.[14]

Schal R. Mem. 9–10 (footnote omitted) raises one other, separate issue suggested earlier in this opinion (see n. 8). It urges the backcharges did not implement the alleged scheme and thus do not satisfy mail fraud requirements:

> If anything, the issuance of the back-charge worked against the alleged underlying fraudulent scheme and made it much more likely that Crescent would discover the scheme. Plaintiff alleges

---

permissible, though incorrect, inference from Section 1961(5)—such courts effectively treated the statutory floor in that provision as though it were a full-fledged definition of "pattern." *Phillips*, which came down less than two months post-*Sedima*, simply continued the pattern (sic) of those earlier cases: It merely cited *Weatherspoon* and did not even mention *Sedima*, let alone make any effort to discuss the "pattern" concept in light of *Sedima*'s plain message "to develop a meaningful concept of 'pattern'" (473 U.S. at 500, 105 S.Ct. at 3287; *id.* at 496 n. 14, 105 S.Ct. at 3285 n. 14). When the Court of Appeals later did begin to address that problem in analytical terms, it rationalized the *Phillips* result in the way just quoted in the text. Total candor would suggest, however, that *Phillips*, had it arisen after rather than before (say) *Marks*, would not necessarily have survived the kind of scrutiny the Seventh Circuit's most recent civil RICO cases exhibit. All the same, this opinion of course accepts *Phillips* as it was explained in *Marks*.

**12.** For example, the Complaint does allege *Schal Defendants* defrauded Crescent through similar racketeering activities on two separate construction projects: the Northwestern Project and the

One Mag Mile Project. No such allegation is made against Northwestern.

**13.** Crescent's (now Brandt's) claims against Northwestern arising out of the Northwestern Project—other than the RICO claim, that is—have been the subject of a pending state court lawsuit filed about the same time as this one, but held in abeyance pending its resolution. Brandt is free (as he has always been) to pursue that litigation.

**14.** This pleading-based conclusion is subject to a caveat neither party has addressed. Section 1964(c) civil liability depends on a Section 1962 violation, and that in turn requires not only racketeering activity but a specified consequence of that activity to the violator—the RICO "person" (see n. 6). Schal Defendants say the only economic benefit derived from any reduction in Crescent's contract price inured to Northwestern, not Schal Defendants. If that is so, one issue Brandt will have to confront on the summary judgment motion is whether Schal Defendants violated Section 1962 (and if so, which of its subsections) even if they did engage in racketeering activity.

that the defendants induced Crescent into performing extra work when they had no intention of ever paying for any of it. The last thing that a defrauder in this situation would do, when the success of the scheme depends upon the victim not learning about the scheme until after-the-fact, is to mail 26 backcharges before-the-fact which the alleged victim uniformly and repeatedly rejects over a period of approximately 18 months.

If that seemingly logical argument is right, it could prove fatal to any RICO claim based on the backcharge mailings as alleged racketeering activity (again see n. 8). But when this Court questioned Brandt's counsel as to that very subject during the February 2, 1987 status hearing, counsel asserted the backcharges did indeed further the scheme (Tr. 15):

> [W]e get these things [backcharges], and the reliance that is made on these things during the course of the performance of the work, in evaluating, wanting to—continuing to go forward, to continuing to put in this additional effect, they put us in a position where we believed we really did have to look at substantial backcharges that we were going to have to negotiate against our claims, and it was one of the hammers and levers they had over our head to force us to keep on doing what we did.

Though that does not appear to make much sense in real world terms, it does call for more fleshing out than the Complaint's skeletal allegations provide. Submissions on the summary judgment motion should reveal (1) whether that poses a question of fact or of law and (2) if the former, whether the factual question is material (that is, outcome-determinative).

One related issue may also have to be dealt with. If the alleged racketeering activity consisted not in the backcharge mailings, but rather in mailings inducing Crescent to do extra work on each of the Northwestern and One Mag Mile Projects (in each instance intending not to pay for the work and thus defrauding Crescent), it becomes important to see whether that factual description fits the One Mag Mile events. If not, the only true racketeering activity would involve the Northwestern Project and Schal Defendants would stand in the same position as Northwestern itself. That too remains to be seen.

### Conclusion

Northwestern's motion is granted, and Schal Defendants' motion is denied. Northwestern is dismissed as a party defendant (but without prejudice to Brandt's refiling the pendent state claims against Northwestern in a state court of competent jurisdiction).

This action is set for a status hearing July 15, 1987 at 9 a.m. to set a briefing schedule for Schal Defendants' pending summary judgment motion. In the interim the parties are urged to consider whether that motion should be dealt with as an issue-narrowing motion (essentially under Rule 16) rather than as a full-fledged Rule 56 motion and, if the former, to consider the scope of the issues to be dealt with.[15]

---

**15.** It is really distressing to have the issues so unfocused in a 2½-year-old lawsuit. That has to be laid at Brandt's doorstep, for the murky character of this litigation is directly attributable to a failure to think through the nature of the asserted RICO claims *before* launching on this federal litigation. Whether that might trigger Rule 11 liability (as Schal Defendants would have it) is also a question for the future.