**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony SPIVEY, Defendant-Appellant.**

**No. 87–1349.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 12, 1987.

Decided March 16, 1988.

As Amended March 16, 1988.

**800**

Jerry B. Kurz, Hall & Kurz, Chicago, Ill., for defendant-appellant.

Stephen Crocker, Asst. U.S. Atty. (Anton R. Valukas, U.S. Atty.), Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, RIPPLE and MANION, Circuit Judges.

BAUER, Chief Judge.

Anthony Spivey appeals from his convictions for conspiracy to possess and actual possession of goods stolen from an interstate shipment, knowing that the goods were stolen. 18 U.S.C. §§ 371, 659. He contends on appeal that the district court violated his sixth amendment right to confront witnesses against him by limiting the cross-examination of his co-conspirator, and that the district court's treatment of his trial counsel deprived him of a fair trial. We reject both claims and affirm Spivey's conviction.

### I.

### A.

Spivey and Albert "Rick" Crumble were long-time friends. Both men frequented a tavern on Chicago's West Side called "The Karate Club," which was owned by the family of their mutual friends David, Randy, and Tom Johnson. Spivey apparently worked sporadically as a volunteer bouncer at the club. In September, 1984, Crumble was a truck driver for Cargo, Incorporated, a Chicago trucking company.

On Friday, September 21, 1984, Crumble invited Spivey to join him in looking for a trailerload of goods to steal. Spivey accepted the invitation, so Crumble went to work that night, picked up his tractor, then picked up Spivey. After Crumble delivered one load of goods, the two men drove around the Santa Fe rail yard in Chicago looking for a trailer to steal. Finding nothing that suited their fancy, they drove to the Burlington rail yard. There they found an overseas trailer, which Crumble attached to his tractor.

Crumble and Spivey drove the trailer back to Cargo's yard, parked in a secluded spot, and broke the trailer's seal.[1] Inside was a thief's dream: Sharp Electronics calculators, turntables, speakers, receivers, and cassette decks. Spivey and Crumble agreed that it was a good load, then began contemplating what to do with it. Spivey contacted a fence of stolen goods, who met with Spivey and Crumble, then left with Spivey to look for another fence, to whom they would offer the load. After nothing came of that idea, Spivey and the fence drove to a warehouse to see if they could hide the stolen goods there. The warehouse door was too low for the trailer, however, and they went back to tell Crumble the bad news. Apparently, they left the trailer at Cargo's yard.

On Saturday, September 22, 1984, Crumble went back to work at Cargo, taking Spivey with him. After work, the two men went to the Karate Club Lounge, where they told David Johnson and another friend, Pierre Cameron, of their theft, and recruited Johnson and Cameron to help unload the trailer. The four men then returned to Cargo, got the trailer of stolen goods, stole another empty trailer marked "AVAZ" from the yard across the street from Cargo, and began transferring the goods from one trailer to the other. The four men unloaded all of the Sharp stereo equipment and calculators from the over-

---

1. At trial, Crumble said Spivey broke the seal; Spivey claimed Crumble did.

seas trailer until they reached copying equipment. At that point, the men moved the AVAZ trailer, now loaded with the stolen stereo equipment and calculators, to a secluded spot. Next, they loaded David Johnson's truck with some of the stolen goods, which each would try to sell individually.

Late Sunday or early Monday, during the night of September 23 and 24, 1984, Crumble moved the AVAZ trailer, first to a restaurant parking lot in Chicago and then back to the Cargo yard, while David Johnson and Spivey followed in Johnson's pickup. At the Cargo yard, the three men loaded more of the loot into Johnson's truck and departed. Unfortunately for them, another Cargo employee who was waiting for the return of his tractor saw Crumble, Spivey, and Johnson leave in Johnson's pickup.

### B.

FBI Agent Thomas Dillon, brought into the investigation by the Chicago police, spoke to Crumble about the theft on September 28, 1984. Crumble denied everything in a lengthy, elaborate statement, all of it lies. On October 4, 1984, the Chicago police arrested Crumble. While in custody, he asked to speak to Agent Dillon. This time Crumble admitted his participation in the theft and gave Dillon the names of several others he said were involved in taking, unloading, and fencing the merchandise. He also agreed to cooperate with the government. In November, 1984, Crumble was indicted on federal charges of theft and conspiracy.[2] On March 8, 1985, he pled guilty pursuant to a plea agreement and the court, aware that Crumble was cooperating with the government, gave him a suspended sentence of five years plus five years probation, the first six months to be spent in custody.

Spivey admitted his participation in the theft in a written statement taken by Agent Dillon on February 22, 1985. Spivey's statement was substantially similar to Crumble's confession, except that Spivey said he thought that the theft of the goods and the subsequent transfer into the empty AVAZ container all may have occurred on Saturday (and not Friday) night, September 22, 1984, although he was not sure. Spivey was indicted in September, 1985. At trial, he proffered an alibi defense. Randy Johnson, one of the Johnson brothers, testified that Spivey was working at the Karate Club Lounge on Saturday, September 22, 1984. Johnson said he remembered that night because there was a large birthday party held that evening for one of the club's regulars. Thomas Johnson, the club's manager, testified, however, that that birthday party had been cancelled. Other members of the Johnson family testified that Spivey was working at the club on the night of the theft. The key witness for the government was, of course, Crumble.

### II.

### A.

Spivey first argues that the district court violated his sixth amendment right to confront witnesses against him by terminating his cross-examination of Crumble before he was able to question Crumble about prior convictions and other bad acts. The government called Crumble to the stand on the afternoon of January 14, 1987. On direct examination, Crumble testified about the events of September 22 through 24, 1984. He also testified that he had pled guilty and served a jail term for his role in the theft, that he was testifying under a grant of immunity, and that he had lied to Agent Dillon on September 28, 1984 when he denied his involvement in the theft.

Defense counsel's cross-examination of Crumble lasted the remainder of the afternoon and early evening. During the cross-examination, defense counsel elicited the following information: that Crumble would not have testified unless granted immunity; that Crumble's September 28, 1984 statement to Agent Dillon was "all lies"; that

---

**2.** Charges of felony theft were filed against Crumble in state court as well, although they apparently were never pursued.

Crumble admitted his participation in the crime to the FBI only after the Chicago police had arrested and jailed him; that the FBI never charged Crumble with the crime of giving a false statement; that after the government informed the court of his cooperation, Crumble was sentenced to only six months of incarceration; that the government had interviewed Crumble three or four times for up to seven hours before trial; and that during these interviews, Crumble overcame his confusion about when the theft actually occurred.

Late in the day, after defense counsel repeatedly asked Crumble whether he had ever attempted to sell any of the stolen merchandise at the Karate Club, to which Crumble repeatedly answered "no," counsel informed the court in a sidebar that he had an additional half-hour of cross-examination concerning prior bad acts. It was approximately 5:20 p.m. Although the government asked the court to limit defense counsel's questioning concerning Crumble's prior acts, the court refused to do so, stating that it was "going to allow a lot of latitude on the cross-examination of [Crumble] in light of the grant of immunity and other matters brought to the attention of the jury." The court then denied defense counsel's request to continue Crumble's cross-examination the next morning.

Defense counsel then questioned Crumble for twenty minutes concerning his second statement to Agent Dillon, after which counsel pointed out that it was 5:40 and that he was now going to delve into whether Crumble had lied to the FBI in other earlier investigations. The court ruled that counsel could inquire into these areas but that he could not prove any lies with extrinsic evidence. Defense counsel then twice more asked to continue the cross-examination until the following morning, but the court refused, stating that "you cannot move as slowly as you are and then say you're not getting enough time."

Defense counsel then questioned Crumble about statements made to the FBI in May, 1984 regarding a trailer Crumble owned in which some stolen Craig radios were found. Crumble admitted on the stand that he knew of the theft of the radios, but said he was not involved in the theft. He also admitted that he had lied to the FBI about his knowledge of the theft. Defense counsel then started taking Crumble through the May, 1984 statement line by line, asking which statements were and were not lies. The court sustained a government objection, advising counsel that "the jury has heard enough about this conversation. ... Move to another area of inquiry, if any." After informing the court that he had an additional half-hour to forty-five minutes worth of cross-examination, defense counsel proceeded to ask more questions about the Craig merchandise theft. After a number of such questions, the court *sua sponte* terminated the cross-examination. The following morning, defense counsel arrived after the 10:00 a.m. starting time, and the court refused to hear his motion to reopen the cross-examination of Crumble. The jury subsequently convicted Spivey.

### B.

The sixth amendment guarantees a defendant the right to cross-examine hostile witnesses. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1973). Thus, a defendant must be granted the opportunity to expose facts from which a defendant could argue that the witness is incredible, *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (citing *Davis v. Alaska,* 415 U.S. at 316–17), and we have stated that defense counsel should be afforded every opportunity to effectively cross-examine a government witness. *United States v. Castro,* 788 F.2d 1240, 1244 (7th Cir.1986).

 This does not mean, however, that the right to cross-examine is unlimited. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1986) (emphasis in original). Hence, the trial court has discretion to impose reasonable limitations on cross-exami-

nation based upon concerns about, *inter alia*, harassment, confusion of issues, and repetitive or marginally relevant interrogation. *Delaware v. Van Arsdall*, 106 S.Ct. at 1435; *see also United States v. Silva*, 781 F.2d 106, 110 (7th Cir.1986). The question on review is whether the jury had sufficient information to make a discriminating appraisal of the witness's motive or bias. *United States v. Rodgers*, 755 F.2d 533, 548 (7th Cir.), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985).

█ In this case, we believe the answer to that question is an obvious affirmative. Before the court terminated the Crumble cross-examination, defense counsel exposed facts showing virtually every possible motive or bias Crumble might have for testifying against Spivey. Defense counsel elicited that Crumble would not have testified but for his grant of immunity, that Crumble cooperated with the FBI only after he was arrested by Chicago police, that thereafter Crumble's state criminal case disappeared, that the government had interviewed Crumble extensively before trial, and that, during these interviews, Crumble crystallized in his mind the times and dates of the theft. Defense counsel also exposed that Crumble's first statement to the FBI was "all lies," and that Crumble had lied to the FBI during the 1984 investigation of the stolen Craig merchandise. Together, this was sufficient information for the jury to make a discriminating appraisal of Crumble's possible motives and biases. That Spivey was not able to pursue certain other avenues of impeachment does not change this conclusion.

Thus, the district court's termination of defense counsel's cross-examination of Crumble did not violate Spivey's sixth amendment rights. Defense counsel had cross-examined Crumble for most of the afternoon and evening. It was only after

defense counsel backtracked, persistently asked improper questions, and repeatedly revised his estimates of how much cross-examination he had left that the court interceded. Even at the court's prodding, defense counsel refused to move on to new areas of inquiry. When it became clear that defense counsel was stalling, the court terminated the cross-examination. Cutting off the repetitive interrogation was within the court's discretion. Indeed, our review of the record indicates that the district court allowed defense counsel a good deal of latitude in his questioning of Crumble, and carefully weighed the consequences of terminating the cross-examination before doing so.[3] In short, there was no sixth amendment violation.

### III.

Spivey next argues that, by terminating defense counsel's cross-examination of Crumble and another witness, Agent Dillon, and by making certain other statements to defense counsel during the trial, the court destroyed the credibility of Spivey's attorney in the eyes of the jury and deprived Spivey of a fair trial. A judge, of course, "should be and be seen to be even-handed." *United States v. Kwiat*, 817 F.2d 440, 470 (7th Cir.1987). Because "the influence of the trial judge on the jury is necessarily and properly of great weight," *United States v. Dellinger*, 472 F.2d 340, 386 (7th Cir.), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1972), "the judge should reserve extensive and harsh criticism of counsel for times when the jury is absent," *Kwiat*, 817 F.2d at 447. Where the trial judge's remarks effectively destroy counsel's credibility in the eyes of the jury, we will reverse a criminal conviction. *United States v. Blakey*, 607 F.2d 779, 788 (7th Cir.1979). Our review of the record,

---

**3.** Toward the conclusion of the defense's case, the trial court explained to defense counsel his reasons for terminating the Crumble cross-examination:

The termination of the cross examination of Mr. Crumble rests on its own merits. I terminated the cross-examination ... after repeated rulings which you chose to ignore, and

you forged ahead when I had made statements at a side bar, and I made specific rulings, and for the abuse of the cross-examination, and your rejection of the court's rulings, failure to comply with them and other reasons clear on the record, the termination of Mr. Crumble's cross-examination followed.

however, indicates that no such thing occurred in this case.

 Spivey argues that the court's termination of defense counsel's cross-examinations of both Crumble and Dillon, coupled with other, for the most part unidentified, remarks addressed to defense counsel destroyed counsel's credibility. We disagree. We have already found no fault with the court's handling of the cross-examination of Crumble, and Spivey does not argue on appeal that the court's termination of defense counsel's cross-examination of Dillon was improper. As to the other remarks, Spivey points to none that fall outside the court's discretion to regulate the conduct of the trial, which, at certain points, requires the court to take positions and remind counsel, sometimes repeatedly, to ask proper questions. *Kwiat,* 817 F.2d at 447; *see also Blakey,* 607 F.2d at 788. Obviously, some of defense counsel's tactics taxed the court's patience below, but the record does not reveal any overt display of contempt for the defense that occurred in the presence of the jury. What our review shows is a no-nonsense judge properly controlling the tempo of the trial before him. In short, the court was doing its job, not prejudicing the jury.

For the foregoing reasons, the defendant-appellant's conviction is

AFFIRMED.