William A. BRANDT, Jr., Plaintiff,

v.

SCHAL ASSOCIATES, INC., et al., Defendants.

No. 85 C 357.

United States District Court, N.D. Illinois, E.D.

Aug. 16, 1988.

David L. Campbell, St. Louis, Mo., pro se.

George Spellmire, Keith Hunt, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Campbell.

Jeff D. Harris, Carmen Caruso, John Foran and Peter A. Silverman, Foran, Wiss & Schultz, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER *

SHADUR, District Judge.

This massive contract-based dispute between a construction management firm and a contractor found its way into federal court solely because of allegations that the management firm and others had violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO").[1] After plaintiff dismissed the RICO claims, some of the prevailing parties have tendered the seemingly inevitable motion for sanctions under Fed.R.Civ.P. ("Rule") 11.[2] More specifically, Schal As-

---

* In terms of District Court judging, serendipity is most often encountered in the form of a newly-decided opinion from a higher court that comes down just as a motion presenting the same or a closely-related problem is about to be decided. That phenomenon is encountered with what seems (at least to this Court) surprising frequency. As chance would have it, this opinion was in the process of final word-processor editing, immediately before issuance, when our Court of Appeals decided the appeal from some of this Court's orders referred to in this opinion (see 854 F.2d 948 (7th Cir.1988) (the "Seventh Circuit Opinion")). Accordingly this opinion was edited to reflect the Seventh Circuit Opinion where relevant. Then just as the revised version was ready for runoff and distribution, Schal Defendants tendered a proposed expert affidavit in response to a like affidavit said to have been proffered by Campbell (but which this Court had not seen). That has led to the addition of an Appendix explaining briefly why such expert opinions—really just another set of lawyers' ar-

guments—play no role in the kind of Rule 11 analysis called for in this opinion.

1. There was and is a parallel state court lawsuit in which part of the same construction disputes continue to be aired. Some aspects of that action become relevant in the later discussion. On an unrelated formal matter, all further references to RICO provisions will take the form "RICO Section—," employing the Title 18 section numbering, while other Title 18 citations will simply take the form "Section—."

2. This is not the first time one party or another has suggested sanctions would be appropriate. Each side has repeatedly asserted the other has engaged in rule-violative conduct. To date this Court (1) has denied plaintiff's sanctions requests out of hand as without colorable merit (see, e.g., Dec. 29, 1987 Tr. with its oral ruling on plaintiff's objections to bill of costs (the Seventh Circuit Opinion, at 955 affirmed this Court's rejection of those objections); see also

sociates, Inc. ("Schal"), Richard Halpern ("Halpern") and Evans Spileos ("Spileos") (collectively "Schal Defendants") have moved for Rule 11 sanctions against David L. Campbell ("Campbell"), the attorney for plaintiff in this action,[3] asserting each of the complaints he filed was not well-grounded in fact or was not warranted by existing law or a good faith argument for the extension of that law. For the reasons stated in this memorandum opinion and order, Schal Defendants' motion is granted and the parties are directed to provide supplemental materials as to the nature and amount of such sanctions.

*Background and Procedural History*

Schal manages the construction of high-rise buildings. Halpern is its President and Spileos one of its employees. Schal was agent for the owners of three projects in Chicago on which it engaged Crescent to furnish and install window wall systems:

1. One Magnificent Mile (the "OMM project"), as to which (a) Schal was acting for M.O.W. Construction Company ("M.O.W."), itself an agent of the project's owners,[4] and (b) Crescent's initial contract price was $4.885 million;

2. Northwestern University School of Law (the "Northwestern project"), as to which (a) Schal was acting directly for the University and (b) Crescent's contract, which included a complete interior and exterior curtainwall system, was for $3.855 million; and

3. Chicago Board Options Exchange (the "CBOE project"), as to which (a) Schal was CBOE's agent and (b) Crescent was hired to perform a $700,000 contract for the CBOE window wall system.

Disputes arose between Crescent and Schal on each of the projects, triggering this lawsuit.

On January 15, 1985 Campbell and William Kabaker ("Kabaker")[5] signed and filed the Complaint. It comprised seven counts spread over 52 pages:

1. Count I charges Schal, Halpern, Spileos, Northwestern, M.O.W. and the

---

Jan. 21, 1987 Mem. Order)) and (2) has refused to rule on defendants' similar requests as premature (see, e.g., part of the "Opinion," 664 F.Supp. 1193, 1200 n. 15 (N.D.Ill.1987), which ruled on defendants' motion to dismiss the second amended complaint). At last it has become necessary to bite the bullet and wade through the piles of memoranda and documentation submitted on this motion.

**3.** Crescent Corporation ("Crescent") originally brought this action, but the ultimate plaintiff was William A. Brandt, Jr. ("Brandt") as assignee for the benefit of Crescent's creditors. Brandt was substituted as plaintiff in the First Amended Complaint ("FAC") filed November 18, 1986. For convenience, this opinion will nonetheless refer to Crescent as plaintiff, because it is the entity allegedly wronged by defendants.

**4.** In the original complaint (the "Complaint") OMM's owners were identified as One Mag Mile Realty, and the partners of the One Magnificent Mile Partnership and One Magnificent Mile Condominium Partnership (collectively "OMM Owners"). In part the Complaint sought to identify a defendant class consisting of the OMM Owners with M.O.W. (though not itself an owner) as the named representative. At that time the case was pending on the calendar of this Court's colleague Honorable Nicholas Bua, and it remained on his calendar for just under

two years (it was reassigned to this Court's calendar in mid-December 1986). Though Rule 23(c)(1) calls for a determination of the propriety of maintenance as a class action "[a]s soon as practicable after the commencement of [the] action," that issue was not addressed during the action's extended life on Judge Bua's calendar. Indeed, this Court's attention was focused on the matter only as the result of a docket review in the course of preparing the background statement for this opinion. As matters ultimately developed on the merits, this Court's dismissal of the OMM–related claim (which necessarily inured to the benefit of all the OMM defendants as parties in privity with the named OMM defendants) really mooted any issues bearing on what would seem to have been a very dubious defendant class (vulnerable under one or more of the Rule 23(a) standards).

**5.** Kabaker was with the Chicago law firm of Epton, Mullin & Druth, Ltd. (the "Epton firm"). Schal Defendants are not seeking Rule 11 sanctions against Kabaker, the Epton firm or any of its attorneys who appeared in this action. Although the court docket does not indicate those attorneys have withdrawn from the case, Campbell Aff. ¶ 7(c) says they have not been involved since a time before the FAC was filed. As discussed later, Campbell points to Kabaker's having signed the Complaint as somehow showing that Campbell's conduct did not violate Rule 11.

OMM owners with RICO violations and asks trebled damages of $53.4 million.[6]

2. Counts II, III and IV are state-law breach of contract actions against Schal and the project owners other than CBOE.[7]

3. Counts V and VI are state-law quantum meruit claims against Schal and the owners of the Northwestern (Count V) and OMM (Count VI) projects.[8]

4. Count VII is a state law claim against all defendants for "fraud and deceit," asking total damages of $52.8 million (including $35 million in punitive damages and $10 million for loss of business reputation).

Only Count I's RICO claim involves a federal question, and there is no diversity of citizenship. All parties have therefore correctly assumed the legal insufficiency of the RICO claim would carry with it the dismissal of the pendent state law claims (see *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). Hence every motion to dismiss the Complaint and its successors has focused solely on the RICO count. Schal Defendants' sanction motion likewise asserts only that the RICO count violated Rule 11, so this opinion focuses on those allegations.

In substantive terms the FAC's RICO allegations (which substituted Brandt for Crescent as plaintiff) are the same as those in the Complaint, but FAC ¶ 52 reduced the ad damnum to $14.8 million after trebling. In the main that difference stemmed from dropping the claim for damages of $10 million (before trebling) to Crescent's business reputation.

Both the Complaint and FAC charge Schal Defendants and Northwestern with having entered into a scheme to defraud Crescent by lulling Crescent into doing substantial extra work on the Northwestern project in the belief that at the end of the work Schal and Northwestern would issue a change order providing for additional payment (FAC ¶ 39(a)). Crescent allegedly performed about $4 million in work over and above the $3.5 million Northwestern contract. All the work was assertedly authorized by Schal pursuant to an oral agreement with Crescent to do the work and to present a bill when Crescent had finished its job.

FAC ¶¶ 39(b) through 39(aa) allege Schal and Northwestern issued 26 "false and fraudulent" backcharges[9] on the Northwestern project as part of the scheme. Those asserted violations of the mail fraud statute (Section 1341) were the principal elements of the alleged "pattern of racketeering activity" necessary to any RICO violation.[10]

In a February 2, 1987 oral ruling this Court dismissed the FAC because, as pleaded, the backcharges were not in further-

---

**6.** This opinion will round dollar values to the nearest thousand dollars (as to amounts under $1 million) or hundred thousand dollars (as to amounts over $1 million).

**7.** Those Counts involve widely differing damage claims:

| Count | Project | Ad Damnum |
|-------|---------|-----------|
| II | Northwestern | $4.1 million |
| III | OMM | $731 thousand |
| IV | CBOE | $ 8 thousand |

**8.** Count V asks the same damages as Count II, and Count VI asks the same damages as Count III (see n. 7).

**9.** "Backcharges" are credits taken by the owner or an agent against a construction contractor or subcontractor, based on claims that the latter has wrongly caused the owner to incur expenses. For example, an owner might issue a backcharge to a carpentry subcontractor for causing damage to work already performed by the painting subcontractor that required remedial expense (in this example, repainting that would trigger issuance of an extra order for added payment to the painter). Other examples of backcharges are given in the text quoted in the Seventh Circuit Opinion, at 950 n. 2. Of course the subcontractor must accept a backcharge for it to be effective, and every construction contract contains a procedure for the resolution of disputes between subcontractor and owner or manager.

**10.** FAC ¶¶ 39(b)–39(bb) also asserted the backcharges constituted theft under Ill.Rev.Stat. ch. 38, ¶ 16–1(a). However, acts chargeable as theft under state law are not "racketeering acts" as defined by RICO Section 1961(1), so that characterization was irrelevant to Count I. Thus the claim of a pattern of racketeering activity necessarily rested solely on the alleged violations of Section 1341.

ance of a fraudulent scheme even if Schal had asserted false grounds for imposing the backcharges. That was so because the FAC did not allege the backcharges were intended to cause Crescent to perform work it would otherwise not have under-taken—indeed the intuitive effect of such backcharges would be just the opposite, warning Crescent of problems in its rela-tionship with Schal.

At that hearing Campbell responded by articulating, for the first time, the notion that the backcharges were faked to place Schal in a better bargaining position with Crescent at the time of negotiations to close out the Northwestern project.[11] In light of that newly-stated (but not fully understandable) position, this Court grant-ed Crescent permission to file a Second Amended Complaint (the "SAC") to clarify the new allegation.

At the same time this Court dismissed M.O.W. and the OMM Owners without granting leave to replead. While Campbell said Schal had also issued bogus back-charges on the OMM project to improve its negotiating posture with Crescent in the Northwestern close-out negotiations (FAC ¶¶ 40(a)–40(f)), he expressly disavowed any allegation that M.O.W. or the OMM Own-ers were participants in that scheme. Be-cause Campbell had thus failed to artic-ulate any colorable theory of RICO liability against those defendants, they were dis-missed with prejudice.

Campbell filed the SAC February 11, 1987, naming only Schal Defendants and Northwestern as defendants. There were three major differences between the SAC and its predecessors:

1. This time the alleged role of the backcharges on the OMM and North-western projects, as bargaining chips to culminate the overall Northwestern fraud, is made clear.

2. Schal Defendants are charged with a second and parallel scheme to induce Crescent to perform non-contract work on the OMM project by promises of con-tract amendments on completion.[12] Backcharges on the OMM and North-western Projects are alleged to play the same role in that scheme.

3. Each of the false backcharges is labeled a RICO predicate offense under a variety of theories.[13]

---

**11.** Campbell's theory was that Schal and North-western had planned all along to dupe Crescent into performing substantial work, not covered by any written change order, by promising to make the necessary adjustments at close out. They would then be in a better position to extract concessions from Crescent during close-out negotiations if they had trumped-up backc-harges (which Crescent believed were valid) to use as bargaining chips. Under that theory the backcharges became a sidelight to the central scheme of inducing Crescent to perform the work by a promise of later payment. Neverthe-less the multiple backcharges were essential if Crescent hoped to allege a pattern of racketeer-ing activity and thus come within RICO.

**12.** That was the first time Crescent alleged Schal induced it to perform extras on the OMM Project while intending never to pay for them. Campbell Mem. 3 n.* says those allegations have always been a part of the complaints, but that is really untrue. Complaint and FAC ¶¶ 40(a)–40(f) did allege *false* (that is, invalid) backcharges on the OMM project, but there was no allegation they were part of a *fraudulent* scheme to induce performance from Crescent on that project. As discussed more fully in the section labeled "RICO's Pattern Requirement," it appears Campbell included allegations of a sec-

ond scheme in an effort to show a "pattern" of mail fraud.

**13.** SAC ¶¶ 35(b)–35(aa) are virtually identical, reading:

Schal, with the knowledge and consent of Northwestern, issued a false and fraudulent back charge on [date] to the August 27, 1982 contract price in the sum of [amount] and mailed the same to Crescent on or about the same day with the intent of depriving Cres-cent of said amount of monies due under its August 27, 1982 contract and exerting unau-thorized control thereover, when defendants knew that the matter and things stated in said fraudulent back charge and on which such contract price reduction was based were false and untrue and that said amounts were not properly chargeable to or collectible from Crescent; which said acts constitute an of-fense of robbery, as that term is used in 18 U.S.C. § 1961(1), being chargeable as theft under the provisions of § 16–1(a) of the Illi-nois Criminal Code, chapter 38, SHA, an of-fense punishable by imprisonment for more than one year; and which said acts are indict-able as mail fraud in violation of § 1341, Title 18, U.S.Code, as robbery and extortion in vio-lation of § 1951, Title 18, U.S.Code, and as

Northwestern and Schal Defendants again moved to dismiss.[14] This Court concluded Northwestern should indeed be dismissed because the allegations against it were of a " 'one-shot effort to inflict a single injury' " (Opinion, 664 F.Supp. at 1198, quoting *Marks v. Pannell Kerr Forster*, 811 F.2d 1108, 1112 (7th Cir.1987)). That dismissal has now been affirmed in the Seventh Circuit Opinion. Because the SAC alleged Schal Defendants' involvement in two similar schemes, however, their motion to dismiss was denied.

Less than three months later (on September 9, 1987) Crescent moved to dismiss its suit. This Court granted voluntary dismissal without prejudice under Rule 41(a)(2), imposing three conditions:

1. Any refiling of the RICO claim was to be in this District Court (an obvious anti-forum-shopping provision).

2. If the RICO claim were thus refiled, all discovery in this action was to be available in the new action.

3. All discovery in this action was to be available in the state court proceedings on state law claims.[15]

This Court rejected Schal Defendants' suggestion of the additional condition that Crescent pay their attorneys' fees and expenses (over and above taxable costs [16]) for two reasons:

1. Brandt was the assignee of a bankrupt's claims, so there was no possibility he could comply with the condition.

2. Much of the discovery and legal work undertaken as part of this case would be valuable in the state court action.

Schal Defendants' Rule 11 sanctions motion followed in due course.

### Schal Defendants' Contentions

Schal Defendants say Campbell violated Rule 11 with each filing of a complaint in this action. For the most part, though, their arguments focus on the SAC and its asserted groundlessness. Campbell too has concentrated on the SAC, providing a 158–page (!) document entitled "Campbell's Litigation Outline" (the "Outline") to detail the factual support for the SAC's allega-

---

violations of the Travel Act under § 1952, Title 18, U.S.Code.
SAC ¶¶ 36(a)–36(f) are identical but for substitution of the OMM project dates. Even apart from the substantive problems posed by those allegations, Rule 8(a) calls for a "short and plain statement of the claim" in a complaint. Whatever might be said of the just-quoted language in those terms, repeating it more than 30 times in a single complaint is really uncalled for. Fortunately for Campbell, Rule 11 does not address egregious violations of the proper forms of pleading.

14. Schal Defendants also moved in the alternative for summary judgment under Rule 56, attaching a good deal of evidentiary material to their submission. After receiving Schal Defendants' opening memorandum, this Court advised the parties it would deal with the dismissal motion in the first instance and would entertain a summary judgment motion only if the SAC survived the motion to dismiss. It is symptomatic of Campbell's litigation behavior in this action that even that simple effort at case management evoked a contested motion: Crescent's effort to have Schal Defendants' Rule 12 motion converted to a Rule 56 motion, and then to stay consideration of that motion to allow yet more discovery! That motion was, of course, denied—but not without Schal Defendants having been forced to respond.

15. Crescent had brought actions against Schal, Northwestern and M.O.W. in the Circuit Court of Cook County, asserting both (1) the claims advanced here as pendent to the RICO claims and (2) mechanics lien claims.

16. Crescent's motion to dismiss had specified it would be responsible for Schal Defendants' costs, and that condition was of course incorporated in the dismissal order. It is a further demonstration of Campbell's litigation behavior that this too resulted in a contested motion to vacate the ensuing taxation of costs against Crescent. Campbell's stated reasons for challenging Schal Defendants' entitlement to costs need not be repeated here—suffice it to say this Court found his position to "border on the outrageous, or maybe cross the border—I am not sure" (Dec. 29, 1987 Tr. 5). Campbell sought to appeal the conditioning of dismissal on an award of costs by briefing the issue before our Court of Appeals. In the Seventh Circuit Opinion, at 954–55, that court refused to entertain the issue because he had filed no notice of appeal (it stated alternatively that this Court's ruling reflected a "routinely impose[d]" condition on a voluntary dismissal and hence involved no abuse of discretion; *id.* at 954–55).

tions on a line-by-line basis.[17]

Ordinarily such an approach to a Rule 11 motion would be inappropriate. Schal Defendants say each of the three complaints violated Rule 11, for which purpose the information available at the time each was filed ought to be assessed. Campbell cannot rely on the results of extensive post-filing discovery [18] to provide the justification for bringing suit in the first place. While "the plaintiff and his counsel are not required to know all the facts before they file a complaint; it is the purpose of discovery to fill in the details" (*Beeman v. Fiester*, 852 F.2d 206, 210–11 (7th Cir.1988)), the plaintiff is expected (1) to have enough evidence to justify a reasonable attorney in concluding the complaint is warranted and (2) to have undertaken a reasonable investigation to ensure the complaint is supported both factually and legally.

Schal Defendants begin with the SAC because they reason that if Campbell is unable even now to identify the factual basis for the SAC, he certainly could not justify his having made the same allegations in the Complaint in 1985. That analysis is sound except in two important respects:

1. Schal Defendants focus in part on the SAC's OMM project fraud allegations, and those had no counterparts in the Complaint and FAC (see the text preceding n. 13). To the extent the SAC violates Rule 11 because of those allega-

tions, the same cannot be said about the earlier complaints.

2. Much of Schal Defendants' attack on the Northwestern project fraud allegations centers on evidence tending to contradict Campbell's allegations. To the extent that evidence was not readily available to him upon reasonable investigation, he cannot be faulted for having proceeded.

That first exception creates no real problem here, but the second is more troublesome. Despite their bulk, the parties' submissions contain very little information on when Campbell actually became aware of evidence, and even less on when he should have become aware of that evidence with the exercise of reasonable diligence. For that reason this Court has not attempted to assess whether Campbell should have uncovered evidence contradicting his Northwestern project fraud claims.[19] Instead it has looked only to see whether he had enough affirmative evidence to justify bringing the claim.[20]

## A. Grounding in Fact

Among other things, Rule 11 requires an attorney to certify with respect to any paper he or she files "that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact." Schal Defendants say the SAC was not well grounded in fact and Campbell should have known so. They as-

---

**17.** Despite the possible implication conveyed by its title, the Outline was not prepared by Campbell *before* he prepared even the last of the complaints filed in this action, as a sort of predicate for the pleading. Rather it is a legal brief (sic) prepared in response to Schal Defendants' opening memorandum.

**18.** Past references by this Court to extensive discovery in this action have brought howls of protest from Campbell, apparently because he feels he has not been allowed all of the discovery he would like. That may have been true to a limited extent (see n. 14). But the Rules generally allow parties to proceed with discovery without active court supervision if there are no disputes (and of course parties are free to provide discovery beyond that called for in the Rules). This Court is thus not in a position to know the precise extent of discovery avail-

able to Campbell here (or, a fortiori, in Crescent's state court actions). But placing a ruler alongside the parties' evidentiary submissions on this motion discloses a combined height of 40 inches! It would hardly seem hyperbolic to describe such sharing of information (whether by formal or informal discovery in this action, by discovery in the state actions or by these and previous filings themselves) as "extensive."

**19.** This approach was not necessary on the OMM project fraud allegations because they were brought only after substantial discovery.

**20.** This approach gives Campbell the benefit of the doubt: Effectively, to the extent he may have obtained evidence tending to support his position in the course of this litigation, he is treated here as having had it prefiling.

sert three major deficiencies in those respects.

### 1. Fraud on the OMM Project

As already mentioned, one new feature of the SAC was the allegation that Schal Defendants had planned to induce Crescent to perform extra work not covered by the OMM contract while intending not to pay for that work, and that the backcharges furthered that fraudulent scheme by improving Schal's negotiating position. Schal Defendants say (1) Campbell invented that scheme out of whole cloth to survive this Court's rulings on the RICO pattern requirement,[21] (2) Campbell had no evidence to support the allegation of a fraudulent scheme on the OMM project and (3) Campbell actually had available evidence disproving the existence of such a scheme. In particular, Schal Defendants contend:

1. Schal stopped paying Crescent because of leakage problems with the building rather than pursuant to a preexisting scheme, and Campbell either knew or should have known that.

2. Even if the leaks had been a pretext to stop payment because the project was well over budget (as Campbell contends), that still does not support allegations of a pre-existing scheme to induce Crescent's performance.

3. Crescent has admitted the validity of many of the allegedly trumped-up backcharges, either in lien waivers or payment applications to Schal.

### 2. Fraud on the Northwestern Project

As to the Northwestern project, the crux of Crescent's allegations is that Schal Defendants and Northwestern schemed to obtain Crescent's purported oral agreement to perform millions of dollars worth of work to be billed at the end of the project. Schal Defendants say that could not have been alleged in good faith because (1) it is absurd to credit the existence of such an oral agreement, given the level of documentation between Crescent and Schal on even minor (e.g., under $1,000) change orders, (2) there is no written evidence of any

such agreement, (3) Crescent has never alleged what Schal person or persons made the assurances on which Crescent supposedly relied and (4) the documents Crescent now points to as showing a promise to pay clearly relate to other matters.

### 3. Northwestern Close–Out Negotiations

Schal Defendants say Crescent's allegations as to the conduct of the close-out negotiations on the Northwestern project were false. In essence, Schal Defendants say Crescent and Schal had reached an impasse, after which Crescent began submitting unsupported invoices for amounts Crescent had never even claimed during the close-out negotiations. Given that history, Schal Defendants say Crescent could not responsibly claim Schal had exerted leverage in the close-out negotiations by threatening to hold up payments on the CBOE and OMM projects or by relying on false backcharges. Similarly, Schal Defendants say the complaints' allegations that Schal Defendants demanded $100,000 from Crescent in return for settling on each project are directly belied by the evidence of the close-out negotiations.

### B. Warrant in Law

Rule 11 also requires that all papers be "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." In part Schal Defendants contend the complaints were not legally warranted because there was no underlying fraudulent scheme to support the mail fraud allegations. Because that argument really goes to the factual basis for the complaints, it will not be treated separately.

However, in some respects the SAC stands on a different footing. There Crescent labeled each of the alleged predicate acts as (1) robbery under state law, (2) robbery and extortion under Section 1951 and (3) violations of the Travel Act, Section

---

**21.** See the "RICO's Pattern Requirement" section of this opinion.

1953. Schal Defendants say each of those allegations is not well grounded in law.

\* \* \*

This opinion can now turn to a treatment of the issues against that framework of Schal Defendants' contentions. There is no precisely logical sequence for such treatment, given the multiple attacks Schal Defendants have launched. Instead the discussion of the numerous issues will essay to follow a reasonably natural flow of analysis.

### RICO's Pattern Requirement

From the outset Crescent has been plagued by the requirement that a RICO plaintiff plead (and eventually prove) that the defendant engaged in a "pattern of racketeering activity." As courts and litigants have struggled to identify workable formulas to test such pleadings, Crescent and its counsel—obviously unsure of their own theories for imposing liability on defendants—have constantly shifted scenarios to fit what they believed the law required.[22]

When Campbell first filed the Complaint it was assumed in this Circuit (as some courts elsewhere continue to hold) that any two acts of racketeering activity constituted a pattern. Thus if the Complaint alleged two such acts, under then-extant doctrine it alleged a pattern of racketeering activity and could hardly be said to have violated Rule 11 on that score. This Court's colleague Honorable Nicholas Bua (to whose calendar this case was first assigned) initially allowed defendants not to answer or otherwise plead until after the then-awaited decision of the Supreme Court in *American National Bank & Trust Company of Chicago v. Haroco, Inc.* (then pending on certiorari to our Court of Appeals, whose opinion is reported at 747 F.2d 384 (7th Cir.1984)).

As it turned out, *that* decision cast no light on the subject (see 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam)), but the sister case of *Sedima, S.P. R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) and its now-famous footnote 14 (*id.* at 496, 105 S.Ct. at 3285) did. There the Court noted two predicate acts alone were not necessarily enough to establish a pattern, for which purpose a plaintiff must establish "continuity plus relationship" of the racketeering acts.

It is an understatement to say the ensuing jurisprudence of "pattern" has been muddled. Schal Defendants' current motion does not call for yet another effort to clear the waters in this still-evolving area of the law. Instead Rule 11 liability on that ground is negated by the very existence of the evolutionary process during the time the various complaints in this action were advanced. If any complaint failed to qualify under Rule 11's "warranted by existing law" test, the alternative of "a good faith argument for the extension [or] modification ... of existing law" would always afford shelter under the circumstances.

For example, Judge Bua initially rejected defendants' motion to dismiss the Complaint for failure to allege a pattern. One year later, based on intervening decisions of our Court of Appeals, this Court dismissed the substantively identical FAC for failure to plead a pattern. This Court found the FAC (as opposed to Campbell's oral representations) failed to allege two similar schemes to defraud Crescent. But that did not bring the existing-law branch of Rule 11 into play.[23]

**22.** This Court has never shared the hostility to RICO litigation that has obviously underlain many judicial efforts to contain its expansion, and that has therefore caused much of the distortion in statutory construction that marks some court opinions. There is no reason RICO should not be dealt with under the same ground rules that govern every other source of federal jurisdiction. At the same time, it is not hard to understand that a good deal of that judicial attitude may be a reaction to litigants who reshape the "facts" to fit what they believe the law requires. Creative lawyering is *always* permissible; creative recasting of the facts, *never.*

**23.** What may be viewed as somewhat mixed signals continue to come from our Court of Appeals (contrast, for example, *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1304–05 (7th Cir.1987) with the several cases distinguishing *Liquid Air* by reading it more narrowly than its own language would suggest—most recently the Seventh Circuit Opinion itself, at 953–54). However this

When Campbell filed the SAC, he was facing this Court's requirement that he plead more than a unitary fraudulent scheme to establish a pattern. And the Opinion, 664 F.Supp. at 1199–1200 found he had done so with respect to Schal Defendants even though Northwestern was not implicated in the second scheme. Schal Defendants now say Campbell made up the OMM project scheme to satisfy this Court's interpretation of the pattern requirement. If so, Campbell violated Rule 11 however this Court's ruling on the FAC conformed to present case law (see n. 23). No attorney would be justified in seeking to escape a court's adverse ruling (even if it were erroneous) by alleging facts he knows to be false (see n. 22).

Campbell argues in passing that the general confusion about the pattern requirement means his RICO allegations cannot have violated Rule 11. That position is clearly without merit. Even where some of the operative legal principles are hopelessly confused, it is possible to imagine legal positions that would violate Rule 11.[24] But that is entirely beside the point, because Schal Defendants are not seeking sanctions for Campbell's pattern allegations. Rather they say his *factual* allegations lacked support, and no amount of confusion about "pattern" pleading can allow fraud allegations absent a reasonable basis for doing so.[25]

### Clearing the Underbrush

Both sides (though Campbell is the primary offender) have raised irrelevant or silly issues that may be dealt with summarily. Those matters will be gotten out of the way before this opinion turns to the significant issues.

■ First, it is of course irrelevant that the SAC survived Schal Defendants' Rule 12(b)(6) motion to dismiss. That tested the legal sufficiency of the pleading, assuming its factual allegations to be true. Schal Defendants are now saying there was no ground for those factual allegations—an altogether different issue.

■ Second, it does not matter that Schal Defendants did not file an answer to the SAC within ten days of the Opinion, so they might have been considered in technical default. Crescent never moved for a default judgment (and had it done so, the motion would have been denied)—it dismissed the action on its own motion. Certainly the failure to answer cannot be regarded as an admission of the factual allegations of the SAC.

■ Third, Schal Defendants' withdrawal of their Rule 56 summary judgment motion in favor of a Rule 16 issue-narrowing motion is not an acknowledgement of disputed factual issues precluding summary judgment. True enough, had this Court ruled against Schal Defendants on a Rule 56 motion, it would seem unlikely that the SAC would later be found violative of Rule 11 as not well-grounded in fact (though that could happen—if, for example, an affidavit creating an outcome-determinative factual issue turned out to be knowingly false). But no such judicial determination has been made. Instead one potentially dispositive motion was withdrawn in favor of another more simple and less risky one.[26]

Court's FAC ruling tracks with the most recent case law, it would be unfair to apply that case law retrospectively to Campbell's earlier filing of the FAC.

**24.** To choose an obvious example, a complaint purporting to charge only one predicate act under RICO would be rule-violative in the face of the statute regardless of how confused judicial constructions of the pattern requirement had become.

**25.** This case thus differs from *Beeman*, 852 F.2d at 212, where our Court of Appeals concluded the fuzziness of the RICO pattern requirement

excused pleading deficiencies on that score, but also (*id.* at 210–11) found the factual allegations well-grounded. See also *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 852 F.2d 936, 945 (7th Cir.1988), which held sanctions on appeal inappropriate given the difficulty of the RICO pattern concept.

**26.** Campbell's argument here is really absurd. After all, Crescent itself later voluntarily dismissed its complaint against Schal Defendants. By a parity of "reasoning" with the position Campbell advances, that dismissal would be tantamount to an admission that the claim had no merit!

■ Fourth, Campbell's notion that Rule 11 sanctions should not be considered when doing so requires an extensive factual inquiry must be rejected. Rule 11 mandates sanctions when its requirements have been violated. This Court cannot shirk its responsibility to enforce the Rule simply because a case is complex or the nature of a suspected violation is such as to require a hard look at evidentiary details.

■ Fifth, the state law claims do not preclude Rule 11 sanctions (Campbell asserts both those claims are well-grounded in fact and based on existing law, so that no complaint in its entirety can be viewed as rule-violative). Two factors torpedo that argument:

1. This Court has consistently held each count of a complaint must meet Rule 11's standards (e.g., *Zick v. Verson Allsteel Press Co.*, 623 F.Supp. 927, 933 n. 12 (N.D.Ill.1985)).

2. Even if that were not so, each complaint relied on the RICO count as the sole basis for federal jurisdiction. Thus a Rule 11 violation as to that count necessarily taints the entire complaint, for without a colorable federal claim the state law claims would fail to satisfy the legal branch of Rule 11.

■ Sixth, Campbell cannot be sanctioned for his motives in coming into federal court. Schal Defendants see his repeated efforts to assert RICO claims as motivated by a desire to take advantage of federal discovery rules and to avoid crowded state court dockets,[27] and they regard those desires as illegitimate. That position is totally unpersuasive. If this forum is legitimately available to Campbell's client, it is his responsibility to seek whatever procedural advantages the forum carries with it. Hence if the RICO claim is well-grounded Campbell cannot be faulted for bringing it in federal court.

**27.** Schal Defendants ignore the most obvious reason for persistent efforts to plead a RICO violation: the potential recoverability of treble damages and attorneys' fees.

**28.** While Kabaker did sign the Complaint, he and his firm withdrew very early on, and most

■ Seventh, Rule 11 is not unconstitutional. There is no constitutional right to file a lawsuit that is not well grounded in fact, and the Rule 11 standard—basically the familiar malpractice standard of reasonable conduct (*Hayes v. Sony Corp. of America*, 847 F.2d 412, 418–19 (7th Cir. 1988))—is not unconstitutionally vague.

■ Finally, the involvement of other lawyers on Crescent's behalf does not insulate Campbell from liability. Campbell seems to say he cannot have violated Rule 11 because (1) Kabaker also signed the Complaint, (2) the Epton firm drafted and initially pursued the state law action on behalf of Crescent and (3) when Campbell prepared the various pleadings he conferred with local counsel Joseph Banks ("Banks"), who had been an ironworker on the Northwestern project. There are both a short answer and longer answers to any such arguments.

Of course the short answer, as Schal Defendants suggest, is that two (or three or four) wrongs do not make a right. It is the pleading itself that must be defensible, regardless of the number of attorneys who participated in its preparation (*Beeman*, 852 F.2d at 210). Now to the longer answers:

1. Kabaker's signature on the Complaint at best leads to an inference that one attorney besides Campbell reviewed the Complaint and found it plausible (although Campbell has proffered no evidence from Kabaker saying he actually did so). Because Kabaker was not an expert in RICO matters, any such inference would have no more than minimal (if any) value. In any case, because Kabaker was not involved in filing the FAC and SAC, even that minimal inference cannot be drawn on those filings.[28]

2. As for the Epton firm, the state court case did not allege fraud. Accordingly that firm's state court filing creates no inference that attorneys other

of Schal Defendants' expenses resulted thereafter, when Campbell was really Crescent's only lawyer. But it would have made no difference for Campbell had Kabaker stayed in the case: Rule 11 liability may be imposed jointly and severally.

than Campbell found the RICO fraud count reasonable.

3. It is hard to see how Banks' involvement helps Campbell. If Banks had actual knowledge of a fraudulent scheme by reason of his employment on the Northwestern project, the prospective need for his testimony could have posed ethical problems for his accepting employment as a lawyer (see Code of Professional Responsibility DR 5–101(B) and 5–102). If on the other hand Campbell is merely suggesting Banks' ironwork experience was helpful in assessing technical issues (as seems more likely, for Campbell has never pointed to any knowledge of fraud held by Banks), that would support only Crescent's state law claims. It would have nothing to do with the RICO count, for Banks (like Kabaker) has no particular experience with RICO claims.

### Rule 11 and the SAC

■ At long last the merits of the sanctions motion can be addressed. Because Schal Defendants primarily assert the SAC was not well-grounded in fact, inquiry must focus on the evidence available to Campbell when he filed that pleading. In that respect Campbell does not have to show Crescent would have been able to win on a fraud theory, or even to show its ultimate ability to defeat a motion for summary judgment based on factual disputes. Campbell need point only to evidence that would create a reasonable belief on his part both that Schal Defendants had behaved toward Crescent as alleged in the SAC and that Crescent could prevail on those allegations.

In the usual case, whether a complaint was well grounded in fact depends on whether the attorney engaged in a reasonable pre-filing inquiry into the facts (e.g., *Beeman*, 852 F.2d at 210–11 and cases cited

there). Here no doubt appears as to Campbell's having engaged in an extensive factual investigation before filing the SAC—indeed before filing the Complaint—so the real issue is whether the factual allegations he made were justified by the evidence that investigation provided.

### 1. OMM Project Fraud Allegations

Campbell devotes the first 48–odd pages of his Outline to explicating his basis for the OMM project fraud charges. All that, however, boils down to his conclusion that there was so much extra work authorized on the project for which Crescent has yet to be paid "for no apparent legitimate reason" (Outline at 5) that Schal must never have intended to pay Crescent when it authorized the work.

But the evidence Campbell adduces—even at this late date—really creates no such reasonable inference. Campbell certainly shows enough evidence for him to have included nonfrivolous assertions that:

1. Crescent had performed a substantial amount of work on the OMM project at Schal's direction

2. for which it had not been paid, and

3. Schal's failure to make payment was in breach of its contract because there were no valid reasons to continue to withhold the funds.

Fraud, however, is a far cry from breach of contract.

Schal has never denied that Crescent performed substantial work,[29] and it admits having stopped payments to Crescent on the OMM project at a time that its records showed Crescent was entitled to about $250,000 in the absence of any offsets. But Schal has always maintained it stopped payments because it believed Crescent was at least partly responsible for serious leakage problems with the building.[30] At least

---

**29.** This statement should not be misread as saying Schal agrees with Crescent's accounting. There are apparently a host of disputes as to Crescent's entitlement to, or the proper amount of, payment for the many change orders, field work orders ("F.W.O.s") and invoices involved. Those disputes are immaterial here, although they certainly demonstrate Campbell would

have been justified in bringing a conventional breach-of-contract lawsuit (in the state court, of course).

**30.** At the same time Schal stopped paying Crescent it stopped payments to two other subcontractors for the same reason. Schal, M.O.W., Crescent, those and other subcontractors and

on its face that is a "legitimate reason" for Schal's withholding funds.[31]

Of course Campbell does not have to take Schal's explanation at face value. It is possible to imagine a set of background facts (or an attorney, with limited knowledge, believing in the existence of such a set of facts) where the reason given was so patently a pretext that fraud could reasonably be suspected and charged.[32] Thus a reasonable attorney might have been suspicious enough to investigate the possibility of fraud further. But no reasonable attorney, armed only with the information available to Campbell at the time he filed the SAC, would have alleged fraud.

After all, there was unquestionably a serious leakage problem, and Crescent was responsible for the design and installation of significant parts of the water barrier system. To this day there has been no definitive determination of responsibility for the problems. And while Campbell makes a detailed technical argument that Crescent was not solely to blame, even he does not argue Crescent was blameless. In short, he points to *nothing* suggesting Schal's stated reason for stopping payments was a coverup for fraudulent intent.

Two other factors really settle Campbell's fate. Either alone would be enough; together they are devastating.

First, in October 1985 (after Schal had stopped payment to Crescent and others) the various interested parties commissioned a study of the leakage problem by Heitmann & Associates (the "Report").[33] Campbell had the Report when he filed the SAC, and the Outline relies extensively on its reasoning. Such attempted reliance is puzzling, for the Report as a whole places a substantial portion of the blame for the leaks on Crescent, concluding that Crescent "clearly failed to meet [its] contractual obligations." [34] Although Campbell might reasonably disagree with that assessment, the Report itself is powerful evidence of a bona fide basis, rather than some fraudulent scheme, for the suspension of payments by Schal. Faced with that evidence (and other indications of Schal's legitimate basis for stopping payment), Campbell needed more

the building's architect are all still embroiled in contract litigation to assess responsibility.

**31.** Nowhere does Campbell say Schal would not have been entitled to stop payment if Crescent were actually responsible for the leakage problem.

**32.** If for example there had actually been no leaks (or if Campbell's client told him there were no leaks and he reasonably believed that), Campbell *might* have been justified in charging fraud. "Might" has to be stressed here, because the further discussion will show an inference even from that hypothetical state of affairs would be weak at best.

**33.** When the Report was commissioned, Schal, Crescent and the others agreed its findings and opinions would "not be offered by any party as evidence for any purpose whatsoever." Schal Defendants say Crescent breached that agreement when it relied on the Report in opposing their summary judgment motion. That need not be decided here, but as for the current motion there is certainly no impropriety in Campbell's relying on the Report or in Schal Defendants' doing the same in response. From a purely technical viewpoint, although Campbell signed the non-use agreement on Crescent's behalf, he was not a "party" to whom it applied. More importantly, Campbell was free to consider the information and reasoning contained in

the Report when he filed the SAC, even though the Report itself might not have been admissible in the action. In fact, Rule 11's imperative really required him to do so. On this motion Campbell's knowledge and investigation form the central issue, and there is simply no way to assess his liability under Rule 11 without reference to the Report.

**34.** To be sure, the Report is highly critical of Schal as well, and Campbell relies on that criticism as justifying the fraud allegations. But Campbell points to nothing in the Report that even suggests, or reasonably implies, fraud as contrasted with simple mismanagement or technical errors. In a letter following up on its findings, Heitmann & Associates opined responsibility was as follows:

| | |
|---|---|
| Schal | 23% |
| Skidmore Owings & Merrill (architect) | 16% |
| M.O.W. | 6% |
| Milwaukee Marble (subcontractor) | 29% |
| Crescent | 19% |
| Esko and Young (subcontractor) | 7% |

That letter was not written until after Campbell filed the SAC, so he could not of course have considered the letter itself when deciding whether to file the SAC. Heitmann's estimates of responsibility were merely a summarization of the overall Report, though, and are reproduced here as a convenient shorthand for the overall conclusions contained in the Report.

than unsupported suspicion before he could charge fraud.

Second, the same conclusion follows even without reference to the objective evidence of the Report reflecting that Crescent was at least partly responsible for the leaks. No other information known to Campbell suggested *fraud*, rather than what Campbell himself acknowledges is the far more reasonable inference that the project had been brought over budget by the extra work and that M.O.W. (or Schal on its behalf) was grasping at ways to cut costs. Perhaps Campbell himself puts it best (Outline at 18 (citations omitted)):

> Based on the documents made available to Mr. Campbell, and the information supplied to him by witnesses and co-counsel, it was reasonable for him to believe that the real reason for the cessation of payments was that Schal had so mismanaged the project and had made such a great number of authorizations for extra work without the Owner's authority, so that the budget was exceeded and the owners either did not have, or just plain refused to come forth with, the money to pay for the extras authorized.[35]

What Campbell there describes as a reasonable inference from the evidence is a mere breach of contract *after* the extra work had been done, rather than a fraudulent scheme *from the inception* to induce Crescent to perform work by promising to pay for it while intending never to do so.

So much for the main thrust of Campbell's position. He also advances two minor points, neither of which carries any greater persuasiveness.

First Campbell says he saw evidence of fraud in Schal's asserting $110,000 in backcharges in the course of the OMM close-out discussions without providing any documentation.[36] Yet it is inconceivable that such claims, even if false, could be part of a scheme to induce Crescent's performance on OMM. It must be remembered that the role of the backcharges in the "scheme" Campbell has enunciated was as bargaining chips (or offsets) to induce Crescent to forgo payment for the extra work it performed. While the first-time assertion of undocumented backcharges[37] in the course of close-out negotiations might be taken as a sign of hard bargaining or even of bad faith, they really cannot be viewed as part of a fraudulent scheme up front. Such claims might help induce concessions from Crescent—but certainly not because Crescent had relied on the accuracy of the charges.

Campbell's second additional point can best be put in his own words (Campbell Aff. ¶ 45 (bracketed inserts added)):

> Ms. Sanderlin [sic, should be "Sanderlan"] C. Smith ["Smith"] was one of the project co-ordinators for Schal on O.M.M. Mr. Campbell and Mr. Banks had been previously advised[38] by Mr. Haddon

**35.** [Footnote by this Court] This quotation from the Outline should not be viewed either as (1) this Court's acceptance of Campbell's description of what he believed as truthful or (2) this Court's agreement with Campbell as to the reasonable inferences he could have drawn from the evidence. Instead the passage is quoted to show that even Campbell's own characterization does not reflect a reasonable belief that fraud had occurred.

**36.** There is considerable irony in Campbell pressing this argument. He also sees fraud on the Northwestern project in Schal's having rejected Crescent's proposed change orders on the ground that *they* lacked any documentation! Needless to say, Campbell perceives no fraud in his own client's pressing for payment of its own undocumented change order claims. Apparently Campbell must view consistency in that respect as "foolish," and hence as "the hobgoblin of little minds" (Emerson, Essay on Self-Reliance). This Court disagrees.

**37.** This labeling of the claims as "undocumented backcharges" (Campbell's description) may be overly generous, for it does not appear Schal ever actually processed the backcharges at issue. What apparently happened was that in the course of close-out negotiations Schal sought offsets to the amounts it calculated as being due, those amounts representing the anticipated future costs of backcharge items. If so, the absence of documentation is completely innocent, as is the fact that the precise amount Schal claimed as an offset varied through the course of negotiations.

**38.** [Footnote by this Court] Campbell never says when he and Banks learned about Smith's alleged statement. Campbell Aff. ¶ 44 refers to a March 11, 1985 walk through on the OMM project with Smith, so this opinion will assume the phrase "had been previously advised" means this occurred before that date.

[Crescent's project manager] that Ms. Smith had told Mr. Haddon that she had been instructed by Schal's Messrs. Spileos and Hoover to sign anything that Crescent wanted to have signed on O.M.M. because Schal wasn't going to pay for it anyway.

That asserted factor is much too little, much too late. For one thing, while the claimed admission would have been of obvious importance on the summary judgment motion, Campbell has never mentioned it before, and even now he has not provided the proper evidentiary support for such an admission.[39] Second, while we are left to guess when Smith is supposed to have made the statement (and the timing of the statement has a direct bearing on its significance), it is hard to see how Campbell could have seen Smith's statement as material evidence of fraud, knowing what he knew when he filed the SAC.

But giving Campbell the benefit of the ambiguity he has thus created, this Court will assume he was told Smith made the statement at about the time she approved change orders and F.W.O.s for which Crescent was not paid.[40] As D.R.Mem. 28–31 shows, each of the unpaid orders Smith approved was signed in June or July 1984. Yet that is the same period of time when Schal and Crescent were attempting to negotiate a close out of Crescent's OMM project. Crescent was demanding immediate payment, while Schal was insisting on the escrow of outstanding funds in case those funds were needed to resolve water leakage problems attributable to Crescent. In that context there is nothing arguably sinister in Smith's alleged comment. Rather than the inadvertent disclosure of a scheme from the outset to induce Crescent's performance, the statement appears to be a frank acknowledgement that Schal now intended to withhold payment because of the leakage problem. Perhaps an attorney already reasonably believing in the existence of a fraudulent scheme could also reasonably view such a statement as corroboration for that belief. But as already demonstrated, Campbell had no reasonable basis for such a pre-existing conviction. Given what he did know when he filed the SAC, Smith's statement was an impermissibly slender reed on which to anchor the OMM project fraud allegations.

One other aspect of SAC's fraud allegations as to the OMM project deserves brief comment. In an attempt to make the alleged OMM scheme closely track that alleged for the Northwestern project, Campbell charged Schal had schemed to use false backcharges as negotiating chips at

---

**39.** Each of Campbell Aff. ¶ 45 and Banks Aff. ¶ 41 refers to Haddon's statement to the lawyers about Smith's comment—certainly relevant on this motion. But what counsel said Haddon told them would have been inadmissible hearsay on the summary judgment motion against Crescent. On that motion Campbell did not provide an affidavit from Haddon or anything else even hinting of Smith's alleged statement, despite its obvious materiality (if Campbell's current version of its thrust is to be credited). Consequently there is nothing in the record to provide such facts as when and under what circumstances Smith is alleged to have made the damaging admissions. Moreover, this extraordinarily belated assertion of the claimed admission has to cast the strongest doubt on Campbell's having actually relied on the statement in deciding to bring the SAC. As the ensuing text discussion reflects, however, Campbell does not succeed even with the benefit of that doubt.

**40.** If Smith made the statement in relation to her signing of work orders for which Crescent *was* later paid (and there were several), her alleged statement that Crescent would not be paid is hardly indicative of fraud. There is, perhaps, the other possibility that Smith made the statement to Haddon sometime after Schal had already stopped payments to Crescent, and that she was then referring to her past practice. In that event her alleged statement might be seen as damaging. But Campbell's affidavit seems to place her statement before April 1985 (see n. 39), and he has never before relied on Smith's statement as supporting his fraud assertions. All this demonstrates how much this Court is required to speculate on this essential aspect of what is now claimed to evidence Schal's fraudulent intent—evidence on which Campbell contends he was entitled to rely in filing the pleadings here. But Campbell certainly has to know (at least now, if not from beginning) the importance of a claim of justifiable reliance in the Rule 11 context. Under all the circumstances, he is not entitled to a strained reading by this Court, thereby resolving in his favor such a possible ambiguity in his self-prepared affidavit.

close-out time.[41] Those are not the "undocumented backcharges" asserted during close-out negotiations, but rather backcharges imposed by Schal earlier in the process. SAC ¶¶ 36(a)–36(f) list six of these backcharges, one as small as $258.55 and all together coming to about $12,500. It has to tax credulity (Campbell's as well as anyone else's) to view that amount of charges as having been fabricated to serve as the linchpin in a fraudulent scheme to induce performance of over $700,000 worth of services.[42] Campbell also says those backcharges were intended as bargaining chips on the Northwestern project where the stakes were over $4 million. That is laughable.

Nevertheless, had Campbell been able to point to *any* significant evidence supporting the overall scheme he alleged, it would at least be conceivable that the backcharges were a minor part of that scheme, and this Court would not impose sanctions for tacking on the backcharges. But there is no such evidence, and the backcharge allegations cannot bootstrap themselves into saving the day.[43]

All in all, this Court concludes the allegations of a fraudulent scheme on the OMM project were not well grounded in fact, and Campbell could not reasonably have believed they were. That means Campbell violated Rule 11 when he filed the SAC.[44]

### 2. Northwestern Project Fraud Allegations

Despite the similarity between the two fraudulent schemes alleged in the SAC, they differ in several material respects. For that reason the easiest way to characterize the Northwestern-related allegations is to contrast them with those about the OMM project:

1. As for the OMM project, the crux of the allegations is that Schal authorized performance of work by Crescent, all the while intending to dishonor its implied promise to pay for that work. As already discussed, those allegations violated Rule 11 because Campbell had no reasonable basis for charging Schal never intended to pay for the work (and also because of the implausibility identified at the end of the preceding subsection of this opinion).

2. In contrast, as to the Northwestern project the SAC says Schal and Crescent agreed that Crescent would perform additional work *and* that Crescent would not bill for that work until the end of the project. Schal says there is no basis for alleging such an agreement.

That purported agreement to postpone billing is not an incidental feature of the charged scheme, but rather its centerpiece. Without such an agreement there is no

---

**41.** Although it is not clear that such an allegation was necessary to plead a pattern of racketeering activity, an attorney could undoubtedly see such allegations as strengthening his or her case (in pleading terms, that is; the ability to *prove* such allegations is quite another matter). Apart from the judicial gloss on the term "pattern," in everyday usage the more similar the two alleged schemes are, the more they seem to fit the term "pattern."

**42.** Once more Campbell might have had sufficient grounds to claim the backcharges were incorrect, but he shows no evidence of a link to a fraudulent scheme. This discussion (and similar analysis elsewhere in this opinion) should not be misunderstood. In technical terms a false backcharge could of course qualify as a fraudulent representation (a false statement that "you damaged the paint job" in the example posed in n. 9), intended to induce reasonable reliance (the carpentry subcontractor's reduction of its own next billing in the same example). What is involved here is the inherent

implausibility—which Campbell had to recognize—of the alleged fraudulent scheme, given both the context and the relative amounts alleged in the SAC.

**43.** Schal Defendants also say that Campbell violated Rule 11 because Crescent had accepted some of the backcharges when initially issued, so he could not reasonably claim now that the charges were false. But Campbell's claim is that Crescent's acceptance of the backcharges was fraudulently induced. Although acceptance of a backcharge might bar a straight breach-of-contract claim, the acceptance itself cannot now be preclusive of a claim of fraudulent inducement.

**44.** To some extent this ultimate conclusion of a Rule 11 violation relies on the discussion captioned "Warrant in Law," where this Court concludes the SAC's allegations of RICO predicate acts other than mail and wire fraud were not based on any reasonable legal position.

conceivable basis for alleging fraud. After all, Crescent never billed Schal for a purported $4 million in work until after it had finished the project. Yet the written contract between Schal and Crescent called for progress payments, and it provided mechanisms for considering change orders as the work proceeded. Campbell also stresses Crescent was experiencing a cash crunch, so those progress payments were important to it. Without the agreement to postpone billing, there is no way to characterize Schal's refusal to pay as the result of fraud. Because Schal focuses on the lack of evidence of such an agreement, this opinion now turns to that issue.[45]

Campbell relies on circumstantial evidence in that respect. This opinion need not explore the details of that evidence or the inferences Campbell seeks to draw from it. In some instances those inferences may be plausible,[46] but in others it requires a quantum leap to accept Campbell's reasoning.[47] For discussion purposes only, this opinion can assume the circumstantial evidence Campbell points to is consistent with his theory, despite its ultimate lack of plausibility. Even on that assumption Campbell still violated Rule 11, because he offers no *direct* evidence whatever of an agreement.

Very often the law finds it necessary to establish an agreement between two actors through circumstantial evidence, such as their behavior after they allegedly reached the agreement. For example, an antitrust plaintiff may (at least in part) prove defendants agreed to fix prices by evidence of parallel pricing behavior. Similarly, when the government attempts to prove a criminal conspiracy it most often (lacking an undercover participant or a co-conspirator's guilty plea plus cooperation) must rely on circumstantial evidence, because it cannot command the testimony of parties to the conspiratorial agreements.

In such instances circumstantial evidence alone must be allowed to establish the existence of an agreement as a matter of necessity:

1. Because the party seeking to prove the existence of the agreement was not privy to the agreement itself, its testimony cannot provide direct evidence of the agreement.

2. Those who enter into illegal agreements rarely find it prudent to leave behind direct documentary evidence of those agreements.

Neither of those conditions applies here. Campbell has alleged a perfectly legal agreement between Schal and Crescent, *his own client.*

By definition, if such an agreement really existed, some Crescent employee had to have entered into it. There has to be someone who can say when and where the agreement was made, what its terms were, and what Schal representative made the

---

**45.** On July 8, 1987 Cook County Circuit Judge Rosemary LaPorte granted Schal's motion for partial summary judgment on Crescent's contract claim. That ruling is not a final judgment and therefore would have *no claim-preclusive* effect here if Crescent's claim were still pending. But even if it did, the issue on this motion is not whether such an agreement existed in fact, but rather whether Campbell had enough evidence to justify alleging such an agreement.

**46.** For example, Campbell notes that Schal at one time requested Crescent to process a change order on part of the work he says was done pursuant to the agreement, but then stopped requesting change orders as Crescent continued to perform added work. While any number of inferences could be drawn from that sequence, one reasonable inference is an intervening agreement to postpone billing. But reasonable inferences cannot be based on evidence viewed in isolation. Campbell cannot explain how a

preexisting agreement to defer billing until the end of the project can be reconciled with the fact that Crescent actually did prepare bills for some of the work at various times *during* the project and then never submitted them to Schal.

**47.** Sometimes Campbell's "reasoning" is downright surreal. Outline at 110 says (quotation not identified in original):

The first proof of the reasonableness of the allegations is that Schal and Northwestern deny that any such agreement ever existed, and, in doing so inherently admit that they "had no intent to issue such change orders but rather intended to procure the provisions of all of [said] work ... without paying Crescent any additional sums therefor...."

Perhaps there exists a parallel universe where "no" means "yes" and "up" means "down" (shades of Orwell's *1984*), but Rule 11 governs filings in *this* universe.

promises on which Crescent is supposed to have relied. Yet Campbell has never come forward with anyone from Crescent to say such an agreement existed or to provide any details about its origin. Nowhere in the extensive evidentiary submissions, either (1) to this Court on the withdrawn summary judgment motion or (2) in the state court on the decided summary judgment motion or (3) back in this Court on the present motion, has Campbell provided a single item of direct evidence of the purported agreement that is the core of his case.

In the run-of-the-mill Rule 11 reasonable-investigation case, the attorney says "my client told me X." At that point the issue becomes whether the attorney performed an adequate pre-filing investigation to determine whether his or her client's story was supported. But here Campbell has never gotten to the first step of pointing to his client's statements to him about the existence of such an agreement. Not even on this motion do his lengthy affidavits, seeking to avoid sanctions, identify a single Crescent employee who told him of an agreement to perform the added work and to delay processing of a change order until the end of the project.[48] One inescapable conclusion flows from all this: Campbell concocted the theory on his own, with no direct evidence from his client.

That conclusion is buttressed (though it needs no support) by the fact that there is simply no reason why there would be no documentary evidence of the alleged delayed billing agreement. Under the contract between Schal and Crescent, all changes were required to be in writing. True enough, the parties *can* waive such a requirement (and can even do so orally), but Campbell has offered no reason why they should choose to do so *and* no direct evidence that they did. This record is chock-full of extensive documentation exchanged between Crescent and Schal over changes of less than $1,000. It is really absurd to think the two firms would at the same time have agreed orally to an open-ended change with an eventual cost of more than $4 million.

Campbell does try to furnish some paper trail for the alleged agreement. On the summary judgment motion, he relied heavily on a November 7, 1983 letter from Schal's Paul Manning ("Manning") to Crescent's Cindy Davidson ("Davidson"). That letter reads in full (M–292):

> In response to your letter to Evans Spileos on October 31, 1983, be advised that we will make every effort to review the five change order requests as listed.
>
> However, presently our first priority is to enclose the building. Be assured that upon completion of the building enclosure this office will review your change order requests.

Campbell repeatedly quotes that second paragraph as "evidence" of Crescent's agreement that Schal could hold off on billing for the changes until end of the project.

But even the paragraph he wrenches out of context does not *say* that.[49] Far worse,

---

**48.** Such a conversation between attorney and client might of course be privileged, although the client's knowledge of an agreement is not, and the client would *want* to come forward with that evidence. On the other hand, Code of Professional Responsibility DR 4–101(C)(4) permits a lawyer to reveal such matters where the lawyer must defend himself "against an accusation of wrongful conduct"—and a Rule 11 claim against the lawyer fits that description (see Nelken, *Sanctions Under Amended Federal Rule 11: Some "Chilling" Problems in the Struggle Between Compensation and Punishment*, 74 Geo. L.J. 1313, 1345 (1986)). For that purpose, of course, an under-seal filing might be sought to protect the separate interests of the lawyer and the client. Indeed, in this instance Campbell has submitted under seal three volumes of mate-

rials that he claims are covered by the attorney-client privilege or work-product doctrine. Those materials evidence his very substantial investigation of Crescent's claims on both the Northwestern and OMM projects. Unfortunately, he has not seen fit to provide any road map through the documents, pointing to those which he believes support his position. Nevertheless, this Court has reviewed the *in camera* submissions as best it could and has found no indication that any Crescent employee ever told Campbell about such an alleged agreement with Schal.

**49.** First, the paragraph speaks not of Crescent delaying the presentation of change orders but rather of Schal delaying its review of Crescent's "change order requests" (and, after all, a "re-

however, Campbell has persisted in quoting only the second paragraph, even after Schal pointed out that *on its face* Manning's letter is about five change orders Crescent *did* submit, and not about any future change orders Crescent might decide to submit. No reasonable attorney would have built an elaborate agreement of the sort alleged here on the slim foundation of the Manning letter.

Campbell next refers to Davidson's internal memorandum of a November 15, 1983 phone conversation with Manning. It says in pertinent part:

> Billing's—we have legitimate adds that have been requested and have not been approved.
>
> I would like to add them to the billing for their approval. Paul [Manning] said that their primary objective is to close-in the bldg. Then once the job is complete Crescent will sit down with Schal and discuss all the extras. Not now.

Again Campbell repeatedly lifts the last three sentences from their context to evidence an agreement to delay billing until project completion. Again even the partial language Campbell quotes does not evidence such an agreement.[50] And again once the entire memo is revealed, it is crystal clear that the conversation was about change orders that Crescent *had* requested and not about changes Crescent had yet to request.[51]

Campbell's treatment of the Manning letter and Davidson memo are merely exemplary of his entire approach to this litigation. Time and again he wrests bits and patches of evidence from their context and, through leaps of illogic, twists them to create support for a concocted theory having no other evidentiary basis. Then when confronted with the emptiness of his position, he either ignores the arguments that defeat his contentions or lashes out at opposing counsel's character.

This Court must reluctantly conclude Campbell had no reason whatever to believe in the existence of any agreement between Schal and Crescent, which is the cornerstone of the Northwestern project fraud allegations—much less that he had a *reasonable* basis for believing in such an agreement. For that reason, he violated Rule 11 when he filed the SAC.[52]

### 3. Northwestern Project Close–Out Negotiations

Schal Defendants also say Campbell's factual allegations as to the conduct of close out negotiations between Schal and Crescent had no reasonable basis in fact.

---

quest" is something that Crescent *has* made, not something it has not). Less significantly (but still negating Campbell's version), the paragraph refers to delay until after the building is enclosed rather than until after completion of the project itself (a much later event).

**50.** As with Manning's letter, Davidson's memo refers only to delaying Schal's review of change orders and not to delaying their submission by Crescent. It is less clear whether Davidson is referring to delay until completion of the job or enclosure of the building. Her memo can be read either way.

**51.** Schal has submitted an affidavit from Manning saying the conversation with Davidson was limited to the same five change orders mentioned in the Manning letter. Outline at 102 n.** says Campbell does not have to take Manning's word for that, "but is entitled to rely on the statements of Crescent personnel that the statements were made in reference to the extra work in the deflection and increase design load areas." That may be true as an abstract matter of law, but it has no bearing here. Only David-

son could have told Campbell what the conversation referred to. Campbell submits nothing that says she told him it was about anything other than the "legitimate adds that have been requested and have not been approved." Her affidavit merely says the exhibit is a true copy of her contemporaneously made memorandum, without shedding any independent light on the content of the conversation itself. And it is not as though Campbell has had no opportunity to cure that deficiency. Schal Mem. 21 noted the problem during the course of the current briefing. Rather than obtain a supplemental affidavit from Davidson, Campbell simply argued unconvincingly that the memo spoke for itself. Again there is an inescapable conclusion: Davidson never told Campbell what he now suggests (in a footnote deep in his unsworn Outline) that she said.

**52.** This conclusion obviates any need to look at the various backcharges to determine whether Campbell could reasonably conclude they were unjustified. In the absence of a fraudulent scheme (and see n. 42), they could not be violations of Section 1341 even if without merit.

In this instance Campbell can invoke substantial support for his characterization of the negotiations in the form of affidavits from Crescent personnel.[53] That would shift the issue to whether other evidence available to Campbell so conclusively demonstrated the falsity of the allegations in the SAC that it was irresponsible of him to file that pleading.

Such an inquiry would be both tedious and, in the legal sense, duplicative. This opinion has already reached the conclusion that the SAC's allegations as to the Northwestern project violated Rule 11 for other reasons. There is no need to essay a second basis for Rule 11 liability. Without the fraudulently induced agreement, the allegations as to conduct of the close-out negotiations are irrelevant—so even if Campbell's close-out allegations did not violate Rule 11, the SAC as a whole did.

*4. Warrant in Law*

All the foregoing has assumed that Campbell needed a fraudulent scheme on which to hang the charged RICO predicate acts of mail and wire fraud. Absent a fraudulent scheme for the mailings and phone calls to be "in furtherance of," there could be no pattern of RICO predicate acts.

While the parties have litigated this case under that assumption, the SAC itself does also allege repeated predicate acts of robbery, extortion and Travel Act violations, and none of those requires a fraudulent scheme. But those allegations are blatant violations of Rule 11's "warranted by law" clause, and Campbell has not even attempted to defend them.[54] To ensure there are no gaps, this opinion will briefly address the legal frivolousness of the non-fraud predicate acts charged in SAC.

First, the SAC says each of Schal's backcharges constituted "an offense of robbery, as that term is used in 18 U.S.C. § 1961(1), being chargeable as theft under the provisions of § 16–1(a) of the Illinois Criminal Code, chapter 38, SHA" (see n. 13). RICO Section 1961 does not define robbery, but the term has a well-established meaning at common law: taking personal property from the person of another against his will by use or threat of force. There could scarcely be a more inapt description of the allegedly false backcharges. Here the purportedly swindled funds (1) were not taken from the person of another, (2) were not taken against Crescent's will and (3) were not taken by use or threat of force. As for Ill.Rev.Stat. ch. 38, ¶ 16–1 ("Illinois Section 16–1"), the Illinois theft statute, it is wholly irrelevant because RICO Section 1961(1) does not include the very different crime of "theft" as a predicate act. To be sure, Ill.Rev.Stat. ch. 38, ¶ 18–1 ("Illinois Section 18–1") does criminalize robbery,[55] but that crime tracks the common law. Congress unquestionably referred to that offense rather than Illinois

---

**53.** Schal Defendants object in particular to allegations that they demanded $100,000 from Crescent in return for closing out each project. However, their own close-out memoranda show they were asking for offsets of about $100,000 on each project, assertedly because of anticipated difficulties with Crescent's work. While Crescent and Schal characterize the discussions very differently, and while the complaints may have overreached to some extent, there was evidence to support Campbell's position (and at least when the Complaint was filed it was unrebutted). Hence his characterization alone did not violate Rule 11.

**54.** Outline at 48–49 says it does not matter if the other charged RICO predicate acts were groundless because the fraud-based acts were well-grounded. This opinion has just concluded that latter premise was itself groundless. More fundamentally, the SAC reflects the unwholesome tactic of alleging alternate theories for liability without any pre-filing investigation, in the hope that one theory will survive. Schal Defendants were not free to ignore charges of multiple acts of robbery and extortion in the SAC, just hoping they would go away. Rather they had to do the legal research needed to show those charges were legally frivolous. Campbell should have done that research *before* filing the SAC. He should not be allowed to impose that incremental cost on Schal Defendants even if the fraud charges *were* justified.

**55.** That statute says:

A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force.

Nothing in the SAC comes remotely close to charging a violation of Illinois Section 18–1.

Section 16–1 when it incorporated the state crime of robbery into RICO.

Next the SAC says each backcharge was robbery and extortion under Section 1951. "Robbery" under Section 1951 also tracks the common law,[56] and the SAC does not allege the elements of that crime.

> "Extortion," on the other hand, is (Section 1951(b)(2)):
>
> the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

Needless to say, neither actual or threatened force or violence is in issue here, and Schal Defendants are not public officials. Only the statutory concept of "fear" requires brief discussion.

Threats of economic loss—of "fear" in that sense—are encompassed by the statute (e.g., *United States v. Lisinski*, 728 F.2d 887, 889–92 (7th Cir.1984)), and portions of the SAC charge Schal threatened Crescent's business reputation if it did not capitulate in the course of the OMM and Northwestern project close-out negotiations. Such threats would arguably ground a violation of Section 1951. But the SAC does not charge a single extortionate threat in the course of the close-out negotiations, but rather dozens—one for each change order. And Campbell does not begin to advance any basis for such shotgun allegations.

Finally, the SAC says each change order violated Section 1952 (the "Travel Act"). Merely to read the Travel Act is to expose the absurdity of that allegation, not only because the statute requires actual travel in interstate commerce, but because of its limited definition of "unlawful activity."

Campbell has never articulated *any* theory to save any or all of the non-fraud predicate acts alleged in SAC—much less a reasonable theory. Those allegations, repeated ad nauseam, also violated Rule 11.

*Earlier Versions of the Complaint*

█ All the discussion to this point, which has shown the SAC violated Rule 11, does not lead automatically to a conclusion that the Complaint and FAC did the same. However, given the nature of the violations as to the SAC, it is a simple matter to supply the missing link.

First, because neither the Complaint nor the FAC alleged a fraudulent scheme on the OMM project, that violation of the Rule is irrelevant as to them. Similarly, neither earlier complaint contained the laundry list of theories to establish predicate acts, so that violation too is irrelevant. But all three complaints shared similar allegations that Schal and Crescent agreed to postpone billing for massive amounts of work. As already explained, Campbell has *never* had a reasonable belief in the requisite evidentiary support for asserting such an agreement. Rule 11 mandated that he have a reasonable belief in the existence of such evidence before he filed the Complaint, much less its successors.[57]

Campbell argues he had little time to investigate before filing the Complaint, justifying any violation there. As a factual matter that argument is ridiculous: There was no statute of limitations problem, and Campbell *did* undertake an extensive prefiling investigation of Crescent's personnel and records. More fundamentally, Camp-

---

**56.** Section 1951(b)(1) reads:
> The term "robbery" means the unlawful taking or obtaining of personal property from the person of or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

**57.** Thus the Northwestern-project-related violation differs from the OMM-project-related violation in another important respect. Because the "gap" in the OMM project allegations had to do with Schal's intent, Campbell could not be expected to have direct evidence of that fact. Accordingly his violation of Rule 11 involved his filing a complaint after years of factual research, when all the circumstantial evidence contradicted his claim. In contrast, as to the Northwestern project Campbell should have had direct evidence of the purported agreement, *to which his client was a party*, at the very outset.

bell's argument misapprehends the nature of the violation. His error was not in failing to uncover evidence contradicting his claim, but rather in concocting a claim in the absence of any evidence to support it.

Both of the earlier versions of the Complaint suffered the same fatal flaw as the SAC. Each of them also violated Rule 11.

### Appropriate Sanctions

Schal Defendants have not indicated the amount they seek as sanctions, and the parties have focused solely on the issue of liability. Of course, now that liability has been determined this Court must impose some sanction on Campbell. Each side is entitled to argue for the sanction they or he feels appropriate, and this opinion will provide a schedule for doing so. However, some preliminary views may help to limit the scope of those filings.

First, Campbell violated Rule 11 by making a federal case out of this dispute. It seems clear that at a minimum Schal Defendants are entitled to recover their actual expenses of drafting and filing every paper in this District Court and appearing at the various hearings held here.[58] Those expenses would not have been incurred "but for" Campbell's ill-conceived filing of this action.

Relatedly, Schal is entitled to all its fees and expenses in researching the RICO issues on the dismissal motions—even when it lost those motions. Had Campbell not brought the factually unsupported complaints, there would have been no need for Schal to challenge the legal sufficiency of his allegations. In "but for" terms, the fact that Schal's arguments were sometimes mistaken is irrelevant—it should never have had to make them in the first place.

On the other side of the coin, it seems equally clear that the contractual disputes between Crescent and Schal are legitimate. Actions dealing with those disputes have been proceeding in state court. Schal would have had to defend them even if Campbell had not brought the RICO claim. Much of the discovery and legal research Schal has undertaken in this action might well have been necessary for that purpose. To that extent, at least, the "but for" nexus between the Rule 11 violation and the legal expense would be lacking, and Campbell should not be compelled to pay. At the same time, defending the same claim in two forums is more expensive, so Schal is entitled to its incremental costs of doing so, to the extent it is able to identify them.

Finally, Schal is entitled to the reasonable expenses of bringing the sanctions motion and of litigating the amount of sanctions. Those expenses should be included in its submissions.

### Conclusion

Campbell violated Rule 11 by bringing and pursuing this lawsuit. Schal Defendants are ordered to submit to this Court and Campbell a proposal for the amount of sanctions, accompanied by supporting documentation demonstrating its conformity to the "Appropriate Sanctions" section of this opinion, on or before August 30, 1988. Campbell is ordered to file his response by September 13, 1988. This action is set for a status conference at 9 a.m. September 20, 1988, at which time the need for (and anticipated scope of) any evidentiary hearing will be discussed.

### Appendix

As noted in n.* at the very outset of this opinion, each party has submitted an affidavit from an "expert," each opining as to whether Campbell violated Rule 11 by filing the several complaints.[1] While there

---

**58.** Of course Campbell may wish to argue that Schal Defendants incurred some of those expenses unnecessarily. He is certainly free to do so, but he should be mindful of the potential for expanding his liability—the well-known fees-on-fees problem—if he is unsuccessful on that score. After all, any defendant (and Schal Defendants are no exception) is entitled to defend vigorously against allegations that it perpetrated a multi-million dollar fraud, which could result in its being mulcted in threefold damages.

**1.** Schal Defendants moved to file the affidavit of its expert Jerome Torshen ("Torshen") on August 15, 1988. That motion referred to what was said to be the previously-filed affidavit of Campbell's expert Steven Sward ("Sward"). This Court has been unable to locate the Sward

may be circumstances in which expert testimony would be useful in determining whether the requirements of Rule 11 have been met,[2] this is not one of them. Whether Campbell had a reasonable basis for filing the complaints is a question for this Court, and the opinion of an attorney (however "expert" he may be thought to be) carries no real evidentiary weight in this case.[3]

Indeed, Campbell's Mem. 24–27, in which he contends it is erroneous for a court to decide Rule 11 motions absent input from "experts" on the lawyer's standard of care, is flat-out wrong. To be sure, our Court of Appeals has recently characterized Rule 11 as "a new form of legal malpractice" (*Hays v. Sony Corp. of America*, 847 F.2d 412, 418 (7th Cir.1988)). But that does not bring into play the Illinois case law (or federal diversity cases applying that case law) as to the kind of proof called for in garden-variety lawyer malpractice cases. Rule 11 sets *federal* standards of conduct, and the myriad Rule 11 cases can be searched in vain for even a hint that the courts look to lawyer "experts" rather than to their own knowledge in stating or applying those standards.

Moreover, neither side's affidavit is useful here even in the limited sense exemplified by n. 2. Sward's affidavit, submitted on Campbell's behalf, merely says (1) Sward is familiar with the requirements of Rule 11 and (2) after reviewing all the materials he believes Campbell did not violate the Rule. But Sward offers no description of what he thinks Rule 11 requires, either in this case or generally (so his asserted familiarity cannot be tested), or of what is considered acceptable practice in the legal community, again either in this case or generally. More importantly, he does not point to specific evidence supporting his conclusion, but rather simply elaborates on what he thinks Campbell might reasonably have alleged. This Court would never impose (or refuse to impose) sanctions simply by announcing its considered judgment without providing some supporting reasons. It is hard to see any weight it can give to the equally unsupported legal conclusions in the Sward affidavit.

Schal Defendants' Torshen affidavit is far better, in that it provides the reasons underlying Torshen's conclusion that Campbell violated Rule 11. But like Sward, Torshen provides no *evidence* of what accepted practice is, in either general or particularized terms. Instead he simply offers a legal discussion of the adequacy of the evidence to support the factual allegations. Regardless of how persuasive Torshen's views may be,[4] they are only legal arguments and not evidence.

Before future litigants go to the expense of obtaining expert affidavits on Rule 11 motions, they would do well to consider carefully the intended evidentiary value of the submission of such affidavits. For the present, this opinion has not had to be modified because it did not find it necessary (or indeed appropriate) to draw on either affidavit.

affidavit in its chambers file (and thus obviously had not considered it in preparing this opinion). Nor does this Court have any recollection of leave having been sought for the filing of the Sward affidavit, and its examination of the Clerk's docket sheet reveals no indication that such an affidavit was actually filed in court. In any case, however, Schal Defendants obviously received the Sward affidavit and counsel for Campbell has now provided this Court with a signed (though undated) copy. Leave to file both affidavits is granted "for whatever they are worth" (as this Appendix reflects, not much).

2. Suppose for example a technically complex patent case, in which the facts shown to have been known to the lawyer when he or she filed suit would have to be explained to the court so

it could evaluate their objective sufficiency in Rule 11 terms. For that purpose expert testimony (or an expert affidavit) might be essential, let alone helpful, to an informed decision on the Rule 11 motion.

3. This is not to say that such an affidavit might not contain persuasive reasoning—but that is not evidence. Then the "affidavit" is really just another legal memorandum—albeit signed under oath, as is customary in the New York practice but (so far as this Court knows) nowhere else.

4. As the body of this opinion—written before the Torshen affidavit was submitted—reflects, this Court agrees with much of Torshen's assessment.